WILCOX MANUFACTURING COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ORELITE MANUFACTURING COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wilcox Mfg. Co. v. Commissioner
Docket Nos. 1839-75, 1873-75.
United States Tax Court
T.C. Memo 1979-92; 1979 Tax Ct. Memo LEXIS 429; 38 T.C.M. (CCH) 378; T.C.M. (RIA) 79092; March 19, 1979, Filed John H. Gorman,James C. Higgins,John F. Rist, III,Michael L. Scales, for the petitioners. Conley G. Wilkerson,Joel V. Williamson, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income tax as follows: Docket No.
Taxable Year Ending
Deficiency
1839-75
April 30, 1969
$168,641.85
April 30, 1970
305,826.87
April 30, 1971
492,544.76
April 30, 1972
40,842.00
1873-75
July 31, 1969
13,653.06
July 31, 1970
18,995.06
July 31, 1971
21,249.60
By an amendment to his answer, respondent claimed an increase of $56,366.01 in the deficiency in docket no. 1839-75 for the year ending April 30, 1969. The great bulk of the deficiencies originally determined and the entire claimed increase in deficiency involve the accumulated earnings *433 tax. Respondent has not imposed the accumulated earnings tax on Wilcox Manufacturing Company for the year ending April 30, 1972. The sole issue remaining for decision is whether petitioners were availed of for the purpose of avoiding the income tax on their shareholders by permitting their earnings and profits to accumulate instead of being divided or distributed, with the result that petitioners are subject to the accumulated earnings tax imposed by section 531. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Wilcox Manufacturing Company
Petitioner Wilcox Manufacturing Company, Inc. (Wilcox) is a West Virginia corporation which had its principal place of business at Raleigh, West Virginia, at the time the petition herein was filed. It filed its Federal income tax returns, on the accrual basis of accounting, for each of the years in question with the District Director *434 of Internal Revenue, Parkersburg, West Virginia. Wilcox is engaged in the manufacture of coal mining equipment. It manufactures the Wilcox electrically powered continuous machine for underground mining of coal, the Wilcox electricially powered roof bolting machine for use in the underground mining of coal to control roof conditions encountered in using mining machinery to extract coal, and electrically powered conveyors for underground transportation of mined materials. The miner and conveyors are manufactured under patents. Ownership and Management. During the period from April 30, 1968 through June 18, 1971, Wilcox had ten shares of common stock outstanding, which were owned as follows: T. G. Todd
5 shares
Bertha Todd (T.G. Todd's mother)
1 share
A. G. Wilcox, Jr.
2 shares
Basil Wilcox
2 shares
During the same period, the corporate officers and directors were: [SEE TABLE IN ORIGINAL] The minutes of a stockholders meeting of Wilcox, held on January 15, 1957, reflect an undertaking by Wilcox's shareholders that, in order to insure that Wilcox would remain a closely held corporation: (1) in the event a stockholder wished to sell his stock in *435 Wilcox during his lifetime, he or she would give Wilcox the right to buy his stock at a price based on evidence of the highest offered price made in good faith and (2) in the event of the death of a stockholder, the stock of the deceased stockholder would be sold to Wilcox at a price based on book value for all current asset accounts and on the opinion of three qualified appraisers for all noncurrent assets. During the period April 30, 1967, through June 18, 1971, A. G. Wilcox, Jr., was vice-president and assistant general manager of Wilcox with basic responsibility for sales management. Beginning in mid-1970, he and T. G. Todd, Wilcox's president, had several disagreements regarding corporate policy. Because of these disagreements, A. G. Wilcox, Jr., wished to sell his stock in Wilcox and began negotiations with T. G. Todd in January 1971 for redemption of his two shares. Despite their disagreements, Todd considered A. G. Wilcox, Jr., a valuable employee and tried to dissuade him. Nevertheless, negotiations were finally concluded. In June 1971, Wilcox redeemed the two shares of stock owned by A. G. Wilcox, Jr., for $900,000 of which $225,000 was paid in cash and the balance *436 was payable with interest in five equal annual installments of $135,000, each evidenced by a promissory note. At that time A. G. Wilcox, Jr., resigned as vice-president and director. T. G. Todd was killed in an airplane crash on September 18, 1971. On December 30, 1971, Wilcox' redemption of A. G. Wilcox, Jr.'s shares was rescinded and cancelled. Two shares of stock were issued to him and he became president of Wilcox. On December 30, 1971, Wilcox redeemed the five shares owned by Todd from his estate for $3,375,000.00. [2] On the same date, Wilcox redeemed the one share of stock owned by Bertha Todd for $675,000.00. On April 26, 1974, the outstanding common stock of Wilcox was purchased by Fairchild Equipment and Supply Co., Inc., now known as Fairchild Incorporated (Fairchild) of Beckley, West Virginia. On April 30, 1974, Wilcox was liquidated and its assets were transferred to Fairchild. Major shareholders' *437 personal income. Wilcox has the exclusive patent rights to the Wilcox continuous miner, used in the low seam mining of coal which is prominent in the West Virginia area. The patent was originally secured from the United States Patent Office on November 7, 1956, by A. G. Wilcox, Sr. After the issuance of this patent, T. G. Todd obtained a one-half interest in the rights to this patent. T. G. Todd and A. G. Wilcox, Sr., then assigned the patent rights to Wilcox in exchange for Wilcox' agreement to pay them an annual royalty based on a percentage of Wilcox' total sales. Subsequently, A. G. Wilcox, Sr., assigned a portion of his entitlement to annual royalties to his sons, Basil K. Wilcox and A. G. Wilcox, Jr., and sold his remaining entitlement to annual royalties to Wilcox. A. G. Wilcox, Sr., died in 1964. During the period at issue, Wilcox paid the following percentages of its total sales to the following individuals in the form of royalty income: Shareholder
Percentage Paid
T.G. Todd
5%
A. G. Wilcox, Jr.
1%
Basil K. Wilcox
1%
Wilcox' payment of the above royalties was made pursuant to the original assignment of the patent rights to the Wilcox continuous *438 miner by T. G. Todd and A. G. Wilcox, Sr. to Wilcox. T. G. Todd, A. G. Wilcox, Jr. and Basil K. Wilcox received royalty income from Wilcox during the years at issue, as follows: Year Ending
T.G. Todd
A.G. Wilcox, Jr.
Basil K. Wilcox
April 30, 1969
$173,768.63
$34,768.32
$34,768.32
April 30, 1970
178,146.10
35,644.18
35,644.18
April 30, 1971
305,165.23
61,033.15
61,033.15
The following schedule shows the salaries of Wilcox' officers during the years at issue: Year Ending
T.G. Todd
A. G. Wilcox, Jr.
Basil K. Wilcox
April 30, 1969
$31,944.00
$13,910.00
$14,510.00
April 30, 1970
35,138.40
16,561.00
16,561.00
April 30, 1971
37,598.09
14,231.90
17,678.27
During the calendar year 1969, 1970 and 1971, T. G. Todd, A. G. Wilcox, Jr., and Basil K. Wilcox had taxable income in the following amounts: Year
T. G. Todd
A. G. Wilcox, Jr.
Basil K. Wilcox
1969
$127,591.57
$ 42,541.51
$ 41,457.56
1970
230,550.78
61,261.89
63,829.51
1971
340,908.10
641,530.25
105,045.39
Self-insurance against fire. Wilcox conducted its manufacturing activities at facilities owned by Orelite *439 Manufacturing Company, Inc. (Orelite) (see p.27, infra), located in Raleigh, West Virginia. Orelite also owned substantially all the machinery and equipment that Wilcox utilized in its manufacturing activities. Wilcox paid Orelite annual rental fees for the use of Orelite's facilities, machinery, and equipment. Neither Wilcox nor Orelite was specifically required to replace the facilities if destroyed by fire or other hazard. The plant facilities rented by Wilcox from Orelite consisted of 22 buildings, 19 of which were built between 1900 and 1910, grouped into six units. The main manufacturing facility consisted of 10 buildings of heavy wood construction immediately adjacent to each other, which were used as foundry and machine shops with heat treating facilities, steel cutting, welding and other preassembly and assembly installations. The buildings, electrical wiring, roof, and floor structure were maintained substantially the same as when originally constructed. At Wilcox' request, Orelite built a new machine shop in Raleigh, West Virginia, in 1970 at a cost of about $100,000, which was borne by Orelite. Raleigh, West Virginia, had no fire fighting facilities during *440 the years at issue. Its residents depended on the volunteer fire department of Beaver, West Virginia, which took a minimum of ten to fifteen minutes to reach Wilcox (excluding time required for firemen to reach the station) and whose equipment consisted of a few auxiliary pumps. Wilcox had only a few fire extinguishers and had received citations from the Occupational Safety and Health Administration regarding the lack of fire fighting facilities. Because of the age and construction of the buildings, the proximity of buildings within each unit and the lack of fire fighting facilities, any fire could easily have destroyed an entire unit, although all units would probably not have been destroyed by a single fire. The greatest fire hazard was in the machine shop located in the main manufacturing facility. Prior to the years in issue, Wilcox had never had a serious fire at its manufacturing facilities. Prior to 1968, Wilcox carried commercial fire insurance covering the facilities rented from Orelite. After an inspection by the carrier, Wilcox stopped purchasing commercial insurance because the proposed premiums were considered prohibitively expensive. It decided to become a *441 self-insurer, except with respect to an insignificant amount, [3] although it did not set up a specific reserve on its books for this purpose. During each of the taxable years in question, Wilcox was entitled to reserve $500,000 for self insurance against fire, covering destruction of its buildings and contents and debris removal. Orelite had a capital investment in the buildings and machinery it rented to Wilcox totaling $405,937.99, $446,113.47, and $576,495.01 for its taxable years ended July 31, 1969, July 31, 1970, and July 31, 1971, respectively. Orelite had a reserve for depreciation relative to the buildings and machinery it rented to Wilcox totaling $259,359.56, $281,815.25, and $312,016.51 for the taxable years ended July 31, 1969, July 31, 1970, and July 31, 1971, respectively. Relocation and expansion. Wilcox' minutes of the annual meeting of stockholders held on January 21, 1969, read, in part as follows: SECOND: Labor conditions in this area are deplorable. Each day it is becoming more difficult to secure trained *442 workmen. THIRD: The tax burden the State of West Virginia has placed on corporations is excessive and does not compare with the surrounding states. At this point, a general discussion was held in regard to the need for a new plant; however, it was the general feeling that due to the poor labor relations and excessive tax, it would not be practical to build a new plant in the State of West Virginia at this time, that the Company start making all plans necessary to construct a new plant within the next five to eight years. During this period, the Company will be able to determine whether the State of West Virginia will be able to determine whether the State of West Virginia is going to give corporations any relief from general taxation and improve labor relations. * * *
Thereupon, on motion duly made, seconded, and carried: That in order for this Company to construct a new plant, set up a RESERVE FOR CONSTRUCTION OF NEW PLANT, an amount equal to at least $3,000,000.00, setting aside amounts necessary over the next five to eight years to cover this amount. The minutes also contain a request by Wilcox that Orelite construct a new machine shop at the Raleigh, West Virginia *443 plant site at an approximate cost of $100,000. The land and buildings at Raleigh were appraised in 1974 for $587,000 and the equipment was appraised in the same year for $509,815. During the years at issue, T. G. Todd and A. G. Wilcox, Jr. made contacts to secure land in Virginia but made no purchases. In early 1974, Wilcox acquired an option to purchase land in Pembroke, Virginia, and the land was purchased by Fairchild after it acquired Wilcox. The production of the Wilcox conveyors was subsequently moved from Raleigh to Pembroke. The main manufacturing facilities were never moved from Raleigh, West Virginia. Wilcox did not obtain outside architectural or engineering estimates concerning the cost of a new plant. However, T. G. Todd was in the construction business and was knowledgeable in the field. Wilcox also had staff who were capable of designing facilities under Todd's supervision. The new machine shop was designed by Wilcox' staff. Self-insurance against product liability. During the taxable years ending April 30, 1969, April 30, 1970, and April 30, 1971, Wilcox mainteined no commercial insurance coverage against product liability and had no specific reserves *444 on its books for self-insurance against such liability. After T. G. Todd's death, when Wilcox' cash reserves were depleted, it obtained commercial insurance against product liability. As a result of an accident involving a jackhead on the Wilcox continuous miner, Wilcox was sued on February 1, 1968, for damages in excess of $100,000. In May 1971, plaintiff in that suit received $40,000. Prior to the commencement of this litigation on February 1, 1968, Wilcox had never been named as a defendant in a major product liability action. As a result of an accident involving a Wilcox roof bolter on September 12, 1969, Wilcox was sued for damages of $800,000 in December 1969.Wilcox' attorney advised them that they might be held liable for the entire claim. However, after a trial in October 1972, the jury found no liability on the part of Wilcox. The suits pending against Wilcox were discussed from time to time by management and caused a great deal of concern. During the years 1966 through 1971, an average of three fatalities per year were caused by underground continuous auger-type mining machinery and approximately one-half of these fatalities were caused by Wilcox machinery. In *445 1972 and 1973, there were 72 and 96 non-fatal injuries, respectively, caused by the same equipment, about one-half of which were attributable to Wilcox machinery. During the 1969 taxable year, Wilcox is entitled to a reserve of $100,000 and, in respect of its 1970 and 1971 taxable years, $540,000 to cover the cost associated with potential liability arising from severe injury to a miner. Such a reserve would cover payment on account of liability to the injured miner and litigation expenses but would not cover the cost of subsequent modifications to equipment. Litigation regarding airplane accident. Wilcox and Bertha Todd, executrix of the Estate of T. G. Todd, were named defendants (as a result of the airplane accident involving Wilcox' corporate airplane on September 18, 1971 in which T. G. Todd died) in a claim filed in the circuit Court of Frederick, Maryland, on or about September 19, 1973. This litigation resulted in a verdict for the plaintiffs, against the defendants jointly, in the amount of $236,575.84 on February 26, 1976. At the time of trial herein, appeal of the decision was pending in the Supreme Court of Maryland.Wilcox' maximum insurance coverage relating to *446 the above claim was $100,000. Unionization of employees. From 1966 through 1968, Wilcox' employees were represented by the United Steelworkers of America. With the exception of this period, Wilcox' employees have never been represented by a union. In early 1971, union organizational drives took place at Wilcox. In April 1972, following several months of activity and meetings, Wilcox' employees voted approximately 2 to 1 against unionization in a certification election. The employees of another manufacturer of mining machines, located about fifteen miles from Wilcox, were unionized during the period 1969 to 1972. Federal Coal Mine Health and Safety Act. For many years, coal mining safety had been a matter of deep concern to the Federal Government and the subject of legislation by the Congress. In September 1968, then President Johnson proposed a strong new Federal Coal Mine Health and Safety Act and then President Nixon submitted a similar proposal in March of 1969. In November 1968, 78 miners were killed in a coal mine explosion near Farmington, West Virginia. This accident was one in a series of disasters over the years. President Johnson's and Nixon's proposals *447 and the Farmington disaster spurred legislative activity commencing in February 1969 and continuing throughout that calendar year and culminating in the enactment, on December 30, 1969, of the Federal Coal Mine Health and Safety Act of 1969 (Mine Safety Act). [4]
From 1955 until passage of the Mine Safety Act, there were no significant changes in Federal regulation of mining equipment and all machinery manufactured by Wilcox was in compliance with applicable regulations. The Mine Safety Act made many changes, imposing significantly stricter noise, dust, electrical and operator safety standards on mining equipment. As a result of these changes, the Wilcox continuous mining machine, roof bolter and conveyor were not in compliance with Federal law. The conveyor ("lo-lo" belt) and roof bolter were brought into compliance shortly after passage of the Mine Safety Act. Although many improvements *448 were made, the continuous mining machine was still not fully in compliance in 1977. At the time the Mine Safety Act was passed, the necessary technological knowledge was not available to bring the Wilcox continuous mining machine into compliance with the law and it was not possible to estimate the cost of compliance with any certainty. The management of Wilcox was concerned that Wilcox might not be able to comply with the Mine Safety Act and might have to discontinue its manufacturing activities. Enforcement was uneven following passage of the Mine Safety Act due to a shortage of mine inspectors, differing interpretations placed on the regulations, which were first promulgated in March 1970, and the technological inability of the industry to comply. Some mines using the Wilcox continuous miner were temporarily closed and the Virginia district threatened to close all such mines. Although there was a question as to when the law would be fully enforced, there was never any question that it would in time be so enforced. Following passage of the Mine Safety Act, Wilcox considered development of a mining machine based on a new concept but this idea was abandoned. Had the new *449 concept been successful, Wilcox would probably have abandoned the machine it was then manufacturing because of the difficulty of bringing it into compliance. Wilcox incurred expenses to comply with the Mine Safety Act, which it deducted from its taxable income for the years incurred, as follows: Year Ending
Amount
April 30, 1970
$ 62,923
April 30, 1971
20,738
April 30, 1972
40,462
April 30, 1973
103,604
April 30, 1974
161,184
TOTAL
$388,911
Fairchild expended $138,475.00 in its year ending January 31, 1975, and $96,083.84 in its year ending January 31, 1976, on modifications to bring the Wilcox mining machine into compliance. Fairchild expects to spend an additional $400,000 placing in service a noise abatement package system that can be installed on Wilcox machines that are already in use. Financial position. Wilcox manufactures its coal mining equipment only after having received a specific purchase order from a customer. Its sales are of two types, namely, regular sales and installment sales. Regular sales are those for which Wilcox customarily receives the total purchase price from its customer within 60 days after the particular mining *450 equipment is accepted by the customer. Installment sales are those for which Wilcox is paid by its customers over a period of months subsequent to the acceptance by the customer of the particular equipment involved. Wilcox' sales are such that Wilcox maintains consistent inventory levels. All sales of mining equipment by Wilcox are financed through the company and not through third parties. Many of the installment sales are collateralized by the equipment sold. The following schedule represents the total regular sales and total installment sales Wilcox made during the years at issue: Year Ending
Regular Sales
Installment Sales
April 30, 1969
$1,543,580.56
$2,162,243.61
April 30, 1970
2,289,509.36
1,419,421.61
April 30, 1971
4,016,401.27
2,103,675.23
Wilcox utilized a direct write-off method of deducting bad debts rather than a reserve for bad debts during each of the years at issue. Wilcox deducted bad debts in determining taxable income in the amounts of $12,266.26, $43,195.99, and $7,957.83 during the taxable years ended April 30, 1969, April 30, 1970, and April 30, 1971, respectively. During the taxable years at issue, Wilcox elected the *451 installment method of reporting income derived from installment sales. If the installment accounts receivable of Wilcox, which were outstanding at the end of each of the taxable years April 30, 1969, April 30, 1970, and April 30, 1971, had been fully collected as of the end of each of the aforesaid years, the income tax liability of Wilcox for each of said years would have been increased as follows: Year
Increased Tax Liability
April 30, 1969
$876,716.39
April 30, 1970
763,714.85
April 30, 1971
696,771.66
The following schedule represents the total current year installment sales collections, the total prior year installment sales collections, and the total collections on all installment sales of Wilcox for the taxable years ended April 30, 1969, April 30, 1970, and April 30, 1971: 4/30/69
4/30/70
4/30/71
Current Year In-
stallment Sales
Collections $ 365,865.24 $ 430,616.48 $ 777,742.43
Prior Year In-
Stallment Sales
Collections
900,879.04
1,117,189.41
1,377,263.41
Total Col-
lections on
all install-
ment Sales
$1,266,744.28
$1,547,805.89
$2,155,005.84
Comparative balance sheets of Wilcox for the years at *452 issue are as follows: WILCOX MANUFACTURING CO. -- BALANCE SHEETS April 30,
April 30,
April 30, ASSETS
1969
1970
1971
Cash and certificates of deposits $ 388,606.68 $ 13,248.58 $ (524,913.88) [1]
Deposit in savings bank
0
828,429.17
1,500,147.63
Tax exempt bonds
938,018.28
894,010.55
1,918,838.31
Cash & invested cash
1,326,624.96
1,735,688.30
2,894,072.06
Accounts receivable, regular
210,825.09
431,625.67
330,238.23
Accounts receivable, miscellaneous
4,301.43
3,221.48
0
Inventory
396,632.93
548,863.33
597,775.84
Accounts receivable, installment [2]
3,776,210.52
3,333,136.43
3,097,156.74
Less: unrealized gross profit
-1,660,447.70
-1,468,372.95
-1,439,578.28
Rent receivable
32,950.00
63,250.00
114,870.00
Notes receivable
0
0
0
Current assets
$4,087,097.23
$4,647,412.26
$5,594,534.59
Stock of Orelite
0
0
419,248.77
Buildings and machinery
102,998.77
104,598.77
109,210.05
Less: accumulated depreciation
- 58,439.70
- 67,430.96
- 70,468.84
Patents
225,462.08
263,295.66
400,245.74
Less: accumulated amortization
- 158,637.24
- 204,272.36
- 349,023.98
Land
0
2,200.00
2,200.00
Deposits and prepayments
1,434.91
2,313.91
2,648.71
TOTAL ASSETS
$4,199,916.05
$4,748,117.28
$6,108,595.04
LIABILITIES AND
SHAREHOLDERS EQUITY
Accounts payable $ 20,574.63 $ 37,716.35 $ 64,419.70
Other liabilities
19,610.07
28,051.00
29,411.11
Federal income tax payable [3]
526,453.31
232,922.39
244,234.08
Current liabilities $ 566,638.01 $ 298,689.74 $ 338,064.89
Mortgages and notes payable
0
0
0
Total debt $ 566,638.01 $ 298,689.74 $ 338,064.89
Capital stock
1,000.00
1,000.00
1,000.00
Retained Earnings
3,632,278.04
4,448,427.54
5,769,930.15
Less: Treasury stock
0
0
0
Total Shareholders Equity
3,633,278.04 [4]
4,449,427.54
5,770,930.15
TOTAL LIABILITIES &
SHAREHOLDERS EQUITY
$4,199,916.05
$4,748,117.28
$6,108,995.04
*453 Summary Profit and Loss Statements of Wilcox for the years at issue are as follows (in thousands): 4-30-69
4-30-70
4-30-71
Gross Receipts
$1,543.6
$2,289.5
$4,016.4
Cost of Goods Sold
313.5
672.8
1,604.0
Gross Profit
1,230.1
1,616.7
2,412.4
Other Income
770.1
917.5
1,356.3
Total Income
2,000.2
2,534.2
3,768.7
General and Administrative
Expense
702.6
961.6
1,391.1
Net Income
1,297.6
1,572.6
2,377.6
Tax-Exempt Interest
3.2
48.6
88.1
Pre-tax Income
1,300.8
1,621.2
2,465.7
Provision for Federal
Income Tax
677.9
810.9
1,144.2
Net Income After Taxes
622.8
810.3
1,321.5
*454 Wilcox' liquidity position at the end of each year at issue, as stipulated by the parties was as follows: April 30,
April 30,
April 30,
1969
1970
1971
Assets: Cash on Hand $ 400.00 $ 400.00 $ 400.00
Cash in Bank - Checking
388,206.68
12,848.58
(524,913.88)
Cash in Bank - Savings
0
828,429.17
1,500,147.63
Rent Receivable
32,950.00
63,250.00
114,870.00
Accounts Receivable - Regular
210,825.09
431,625.67
330,238.23
Accounts Receivable - Installment
3,776,210.52
3,333,136.43
3,097,156.74
Accounts Receivable - Other
4,301.43
3,221.48
0
Inventory
396,632.03
548,863.33
597,775.84
Tax Exempt Bonds
938,018.28
894,010.55
1,918,838.31
Total Current Assets
[1]$5,747,544.03 $6,115,785.21
$7,034,512.87
Liabilities: Accounts Payable
20,574.63
37,716.35
64,419.70
Notes Payable
19,610.07
28,051.00
29,411.11
Federal Income Tax Payable
526,453.31
232,922.39
244,234.08
Total Current Liabilities
566,638.01
298,689.74
338,064.89
Net Liquid Assets
[1]$5,180,906.02 $5,817,095.47
$6,696,447.98
Wilcox had accumulated *455 earnings and profits of $3,632,278.04 on April 30, 1969, $4,448,427.54 on April 30, 1970, and $5,769,930.15 on April 30, 1971. [5] This represents increases of $576,405.21 in fiscal year 1969, $816,149.50 in fiscal year 1970, and $1,321,502.61 in fiscal year 1971. Wilcox' operating cycle, i.e., the period it took to convert cash into raw materials, raw materials into inventory, inventory into sales and the time it took to collect for the sales, relative to its regular sales for the taxable years ended April 30, 1969, April 30, 1970, and April 30, 1971, totaled 7.61 months, 6.47 months, and 3.93 months, respectively. Wilcox' operating cycle, i.e., the period of time it took to convert cash into raw materials, raw materials into inventory, inventory into sales and the time it took to collect for the sales, relative to its installment sales, totaled *456 22.83 months, 34.34 months and 20.97 months for the years ended April 30, 1969, April 30, 1970, and April 30, 1971, respectively. The parties have stipulated that Wilcox had a reasonable business need for working capital totaling $3,120,701.72, $3,511,092.43, and $3,248,546.42 for the taxable years ending April 30, 1969, April 30, 1970, and April 30, 1971. Dividends. Wilcox paid no dividends from the period beginning April 30, 1956, through the period ending April 30, 1971. During the years at issue, T.G. Todd controlled the dividend paying policies of Wilcox. Payment of dividends was never discussed at shareholders' or directors' meetings during the years at issue. Orelite Manufacturing Company
Petitioner Orelite Manufacturing Company, Inc. (Orelite) is a West Virginia corporation and had its principal place of business at Raleigh, West Virginia, at the time its petition herein was filed. It filed its Federal income tax returns on the accrual basis of accounting for the years at issue with the District Director of Internal Revenue, Parkersburg, West Virginia. During the years at issue, Orelite's sole business activity was the rental of real property, equipment, *457 and machinery to Wilcox. See pp. 8 and 11, supra. From June 28, 1956, through December 30, 1970, Orelite had 80 shares of common stock outstanding, which were owned equally by T.G. Todd and Wilcox Industries, Inc. During the years at issue the shares of Wilcox Industries, Inc., were owned by heirs or members of the A. G. Wilcox, Sr. family in the following proportions: Douglas C. Wilcox
1,361
Helen G. Anderson
1,361
A. G. Wilcox, Jr.
851
Erma M. Wilcox (wife of
A. G. Wilcox, Jr.)
1,023
William A. Wilcox
850
Lorrene Wilcox
1,023
John L. Wilcox
908
Virginia F. Wilcox
1,023
Nina Dodd
908
Kenneth C. Gross
1,023
Ina Gross
943
Basil K. Wilcox
851
Ruth M. Wilcox (wife of
Basil K. Wilcox)
682
TOTAL
12,807
On December 31, 1970, Wilcox purchased all 80 outstanding shares of common stock of Orelite for $419,248.77. By virtue of its acquisition of Wilcox' stock on April 26, 1974, Fairchild acquired 100 percent ownership of Orelite. On April 30, 1974, Orelite was liquidated and its assets were transferred to Fairchild. During the period August 1, 1968, through July 31, 1973, Orelite made capital expenditures with respect to its property *458 at Releigh, West Virginia, which was rented to Wilcox, as follows: Year Ending
Amount
July 31, 1969
$ 14,920.00
July 31, 1970
40,175.48
July 31, 1971
130,381.54
July 31, 1972
2,496.35
July 31, 1973
78,678.96
At Wilcox' request, Orelite built a new machine shop to be leased to Wilcox. Design of the shop was commenced in late 1969 and construction was completed by the end of 1970. The following is a summary of Orelite's balance sheets for the years at issue: 7-31-69
7-31-70
7-31-71
Assets: Cash on Hand and in Bank
$179,192.30
$ 48,642.72
$155,422.40
Accounts Receivable
26,918.19
14,857.32
20,605.38
Building and Equipment
405,937.99
446,113.47
576,495.01
Reserve for Depreciation
(259,359.56)
(281.815.25)
(312.016.51)
Land
3,200.00
3,200.00
3,500.00
Tax Exempt Bonds [State of
W. Virginia]
0
208,866.68
106,233.34
Intangible Assets
5,622.44
5,622.44
5,622.44
Amortization
(4,902.35)
(5,268.93)
(5,622.44)
Other Assets
241.91
241.91
241.91
Total Assets
$356,850.92
$440,460.36
$550,481.53
[1]Liabilities: Accounts Payable $ 1,444.15 $ 1,444.15
$ 12,302.05
Capital Stock
8,000.00
8,000.00
8,000.00
Paid-in Capital
8,750.00
8,750.00
8,750.00
Retained Earnings
338,656.77
422,266.21
521,429.48
Total Liabilities and Capital
$356,850.92
$440,460.36
$550,481.53
*459 Orelite's comparative profit and loss statements for the years at issue are as follows: Orelite Manufacturing Company, Inc. Comparative Profit and Loss Statement
7-31-69
7-31-70
7-31-71
Income: Other Interest $ 5,981.44 $ 7,472.04 $ 3,402.17
Gross Rents
104,250.53
140,673.93
184,998.68
Sale of Scrap
0
0
1,509.00
Total Income
$110,231.97
$148,145.97
$189,909.85
Operating Expense: Repairs $ 369.79 $0 $ 1,386.00
Taxes
6,107.17
6,178.12
8,706.69
Amortization
366.58
366.58
353.51
Depreciation
22,843.83
22,455.69
30,201.26
Other Deductions
532.00
657.65
663.75
Total Operating Expenses
$30,219.37
$29,658.04
$41,311.21
Net Income from Operations
$80,012.60
$118,487.93
$148,598.64
Other Income: Tax Exempt Income
0
0
5,366.66
Subtotal
$80,012.60
$118,487.93
$153,965.30
Less: Provisions for
Federal Income Tax
34,878.49
53,734.78
71,327.35
Net Income
$45,134.11
$ 64,753.15
$ 82,637.95
The following schedule shows Orelite's accumulated earnings and profits, increases therein, and net liquid assets during the years at *460 issue: Accumulated
Net Liquid Year Ending
Earnings & Profits
Increase
Assets
July 31, 1969
$303,778.28
$45,134.11
$169,787.85
July 31, 1970
368,531.43
64,753.15
217,187.79
July 31, 1971
450,102.13
71,570.70
198,631.72
During the period July 31, 1968, through July 31, 1971, Orelite's officers [6] were: [SEE TABLE IN ORIGINAL] None of Orelite's officers were paid any compensation for services during the period July 31, 1956, through July 31, 1971, and Orelite had no other employees during that period. From July 31, 1956, through July 31, 1971, Orelite paid no dividends. ULTIMATE FINDINGS OF FACT During the taxable years ending April 30, 1969, April 30, 1970, and April 30, 1971, Wilcox did not permit its earnings and profits to accumulate beyond the reasonable needs of its business. During the taxable year ending July 31, 1969, Orelite did not permit its earnings and profits to accumulate beyond the reasonable needs of its business. During the taxable years ending July 31, 1970, and July 31, 1971, Orelite did permit its earnings and *461 profits to accumulate beyond the reasonable needs of its business and its failure to divide or distribute such earnings and profits was for the purpose of avoiding the income tax on its shareholders. OPINION Respondent determined that petitioners were availed of for the purpose of avoiding the income tax with respect to their shareholders by permitting earnings and profits to accumulate instead of being distributed, and are consequently subject to the accumulated earnings tax. See sections 531-537.Although the proscribed purpose of tax avoidance is an essential prerequisite to imposition of the tax, section 533(a) provides that, unless the taxpayer proves to the contrary by a preponderance of the evidence, the fact that its earnings and profits were permitted to accumulate "beyond the reasonable needs of the business" is determinative of such purpose. Such reasonable needs include reasonably anticipated needs. See section 537. Thus, resolution of the issue before us depends, first, upon whether petitioners accumulated earnings and profits beyond the reasonable needs of their businesses and, second, whether they did so with the purpose of tax avoidance. Alex Brown, Inc. v. Commissioner,60 T.C. 364, 366 (1973), *462 affd. per curiam 496 F. 2d 621 (6th Cir. 1974).Both questions involve a factual determination. Helvering v. Nat. Grocery Co.,304 U.S. 282 (1938); John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 467 (1965). Before turning to an analysis of petitioners' financial positions and reasonable business needs we note that, in the first instance, the determination of reasonable business needs is a matter for the officers and directors of the corporation and that we are reluctant to substitute our judgment for theirs, absent facts and circumstances that clearly show the accumulations were unreasonable and made for the prohibited purpose. Henry Van Hummell, Inc. v. Commissioner,364 F. 2d 746, 749 (10th Cir. 1966), affg. T.C. Memo. 1964-290; Atlantic Properties, Inc. v. Commissioner,62 T.C. 644, 656 (1974), affd. 519 F. 2d 1233 (1st Cir. 1975). We recognize, however, that this generalization must take into account the applicable rules as to burden of proof. [7]Faber Cement Block Co. v. Commissioner,50 T.C. 317, 329 (1968). *463 The critical factor in determining whether a corporation Wilcox Manufacturing Company has accumulated earnings and profits beyond its reasonable needs is not the size of the accumulation but the nature and availability of the assets which comprise it. As the Supreme Court stated in Ivan Allen Co. v. United States,422 U.S. 617, 628 (1975), "[the] question, therefore, is not how much capital of all sorts, but how much in the way of quick or liquid assets, it is reasonable to keep on hand for the business." See also John P. Scripps Newspapers v. Commissioner,supra at 467. Thus, our first step is to determine Wilcox' net liquid assets for the purpose of determining available funds for meeting its business needs. Faber Cement Block Co. v. Commissioner,supra, at 330. The parties have stipulated that Wilcox had net liquid assets of $5,180,906.92, $5,817,095.47, and $6,696,447.98 as of the close of taxable years ending April 30, 1969, April 30, 1970, and April 30, 1971, respectively, "without taking into consideration any potential Federal income tax liability on the unrealized profit attributable to Wilcox' installment *464 sales and without taking into consideration any provision concerning a reserve for bad debts attributable to Wilcox' installment sales." On brief, however, Wilcox initially takes the position that accounts receivable with respect to installment sales should be included in net liquid assets only to the extent they are collectible within twelve months. Respondent, in reply, argues that he agreed to compute Wilcox' working capital needs using the Bardahl formula [8] and an operating cycle which, with respect to installment sales, ranged from 20.97 months to 34.34 months on the understanding that Wilcox' net liquid assets would be computed by including all installment accounts receivable. At the outset, we note that we do not lightly disregard matters to which the parties have stipulated. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976). See also Henry v. Commissioner,362 F. 2d 640, 643 (5th Cir. 1966), affg. T.C. Memo. 1964-170. Unless such matters are clearly contrary to the record or the law, we will not refuse to be bound by them. *465 Jasionowski v. Commissioner,supra; Estate of Saia v. Commissioner,61 T.C. 515, 519-520 (1974). Moreover, the effect of Wilcox' position is to permit it to retain an amount sufficient to meet its operating costs for a two to three year period and at the same time assume it will not collect its receivables due beyond one year. [9] We need not and do not decide what the proper disposition of future installments of accounts receivable may be (either in the context of determining liquidity or working capital needs) where the operating cycle, upon which the working capital need is based, is less than one year or where there has been no stipulated agreement between the parties. However, when the need of the business for working capital has, by agreement of the parties, been extended into future years, as is the case herein, it is not so unreasonable to include such accounts receivable in the determination of net liquid assets that Wilcox should be relieved of its stipulation. Cf. Motor Fuel Carriers, Inc. v. Commissioner,559 F. 2d 1348, 1356 (5th Cir. 1977), rev'g. on other grounds T.C. Memo. 1975-296. This is particularly *466 true where reservations on other specific grounds have been inserted in the stipulation. Accordingly, we reject Wilcox' contention. *467 In the alternative, Wilcox argues, in accordance with the reservation in the stipulation, that its accounts receivable from installment sales should be reduced by a ten percent reserve for bad debts and by the taxes that would be payable if the accounts receivable were collected in any one year. Respondent, in his amendment to answer, alleged that in computing net liquid assets in his statutory notice of deficiency, he erroneously allowed reserves for bad debts with respect to installment sales receivables in the amounts of $337,621.05, $333,313.64 and $309.715.67 for the years ending April 30, 1969, April 30, 1970, and April 30, 1971, respectively. At trial, respondent assumed the burden of proof with respect to lack of need for bad debt reserves in these amounts.See also Rule 142(a), Tax Court Rules of Practice and Procedure. Undoubtedly some of the future installment sale accounts receivable will prove not to be collectible and, as a result, there should logically be some reduction to reflect this condition in determining the amount of net liquid assets available for the needs of the business and dividends. But where the doubtful element has been taken into account in the calculation *468 of operatingcosts and has, therefore, increased working capital needs, it is obvious that any further recognition of the bad debt element through a reduction in the amount of net liquid assets would be duplicative. Here the record clearly indicates that Wilcox used the direct write-off method in respect of bad debts, that its actual bad debt experience was in far lesser amounts than respondent allowed by way of bad debt reserves in the deficiency notice, and that the actual bad debt experience has been taken into account in computing Wilcox' working capital needs. Wilcox introduced testimony of an accountant who was involved in the audit of Wilcox at the time of the contemplated acquisition of Wilcox by Fairchild in 1974. He testified that he considered a reserve for bad debts of approximaely 15 percent reasonable but he furnished us with no indication of the foundation of his conclusion and his testimony struck us as indicating a point of view that was more reflective of advice to Fairchild as a prospective purchaser with respect to a discount that might be the subject of bargaining than as a realistic evaluation of the likelihood of the uncollectibility of Wilcox' accounts receivable. *469 We consider that testimony as having no probative value in the instant case. Under all the circumstances, we are convinced that there should be no adjustment for a bad debt reserve to the stipulated amounts of net liquid assets. We reach a different conclusion as to the claimed offset of income taxes on the unrealized profit on installment sales receivables attributable to years other than the particular year with respect to which net liquid assets is being determined. Wilcox does not claim any adjustment with respect to taxes attributable to current year collections on installment accounts receivable. These have been taken into account in determining accumulated taxable income under sections 535(a) and 535(b)(1). With respect to the tax on collections in future years, respondent has confused the infusion of such taxes into the determination of working capital needs (relying on the rejection of such use in Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200[10] and the impact of such taxes insofar as installment accounts receivable are concerned in the determination of liquidity. We think it obvious that such taxes would reduce the funds available *470 to Wilcox and therefore its net liquid assets. This is not a situation where the existence of future receipts giving rise to income or the determination of future profit is a matter of speculation. The amount of the receipts, the amount of the profit, and the tax bite can be determined. Indeed, the parties herein have so stipulated. See p. 20, supra. Such being the case, we think that the rationale of the Supreme Court in Ivan Allen Co. v. United States,supra, is applicable. [11] See also Battlestein Investment Company v. United States,442 F. 2d 87, 89 (5th Cir. 1971) (where the Court refers to the netgain on an installment note). Golconda Mining Corp. v. Commissioner,58 T.C. 736, 739 (1972), rev'd on another issue 507 F. 2d 594 (9th Cir. 1974) does not preclude the allowance of the reduction in net liquid assets claimed by Wilcox. In that case, the transactions were of such a character that a calculation of the tax impact was "impossible." [12] We hold that the stipulated amounts of net liquid assets for each year at issue should be reduced by te Federal income taxes, attributable *471 to the installment sales receivable included therein but not due until subsequent taxable years, in the amounts stipulated by the parties. [13]
*472 Stock redemptions. One reason asserted by Wilcox for accumulation of earnings and profits is provision for stock redemptions. We first consider the redemption of A. G. Wilcox, Jr.'s stock. The redemption of a dissenting minority shareholder's stock in order to promote harmony in the conduct of a business is a valid business purpose. Mountain State Steel Foundries, Inc. v. Commissioner,284 F. 2d 737 (4th Cir. 1960), revg. on other grounds T.C. Memo. 1959-59; Dill Manufacturing Co. v. Commissioner,39 B.T.A. 1023 (1939). [14] We think the facts herein fall within the parameters set by these cases. A.G. Wilcox, Jr., disagreed with Todd on a number of policy questions. Although the fact that Todd tried to persuade him to stay on raises some question as to the severity of the rift between the two men, we are satisfied that serious differences did exist. Given that A. G. Wilcox, Jr., insisted on leaving the company, it is clear that it served the interests of Wilcox to redeem his shares. The alternative would have been to risk his selling to an undesirable third party or, in the event he was unable to find a buyer, to suffer the *473 disruption that would undoubtedly be caused by, in effect, forcing him to remain a shareholder. Although his shares were not redeemed until June 19, 1971, we are satisfied that by April 30, 1971, the end of the last year in issue, the handwriting was on the wall. We think the reasoning which justifies accumulations for contingent liabilities is applicable in light of the high likelihood that the contingency would materialize. [15] We hold that $900,000, the amount Wilcox agreed to pay to A.G. Wilcox, Jr., was a reasonable accumulation for this purpose at the close of Wilcox' fiscal year ending April 30, 1971. [16]
We reach a different conclusion *474 with respect to the redemption of T.G. Todd's stock. First, because the corporation was obligated to purchase the shares of every deceased shareholder without regard to the effect of his death on corporate operations, we have our doubts as to whether the agreement served a business purpose or merely the personal purpose of providing the deceased shareholder's estate with funds for taxes, administration expenses, etc., and its beneficiaries with liquid assets. See The Kirlin Co. v. Commissioner,T.C. Memo. 1964-260, affd. per curiam 361 F. 2d 818 (6th Cir. 1966); Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, Sec. 8.07 (1971). Compare C.E. Hooper, Inc. v. United States,539 F. 2d 1276, 1289-90 (Ct. Cl. 1976) (option agreement); Emeloid Co. v. Commissioner,189 F. 2d 230 (3d Cir. 1951), revg. 14 T.C. 1295 (1950) (insurance to fund redemption was business need for purpose of excess profits tax). Even putting aside the question of whether the requisite business purpose was present, we are satisfied that Wilcox did not retain its earnings for this purpose and think that no *475 accumulation was reasonable. T.G. Todd was only 50 years old at the time of his death and there is no evidence that he was in poor health. Nor does the record contain any indication that Wilcox in fact accumulated its earnings and profits for this purpose. Moreover, we note the opportunity for abuse that would exist if a corporation could accumulate large amounts to redeem stock of deceased shareholders far in advance of the likelihood of their deaths, especially where life insurance is a realistic alternative. See Bittker & Eustice, supra.
Finally, we note that, although section 537(a)(2) provides that "reasonable needs of the business" includes the "section 303 redemption needs of the business," section 537(b) defines "section 303 redemption needs" as the amount needed "with respect to the taxable year of the corporation in which a shareholder of the corporation died or any taxable year thereafter." T.G. Todd died in fiscal year 1972, a year after the years in issue. Self-insurance against fire.Wilcox contends that it required a reserve of $800,000 to provide adequate protection against fire in its manufacturing facilities. In his deficiency notice, respondent *476 allowed an accumulation of $450,000 for this purpose but, in his Amendment to Answer he took the position that no reserve for self-insurance against fire was reasonable. Respondent has assumed the burden of proof with respect to Wilcox' need of less than $450,000 as a reserve for the risk of loss from fire. See also Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent admits that self-insurance against contingencies may be a reasonable purpose for accumulation of earnings. Smoot Sand & Gravel Corp.,241 F.2d 197, 203 (4th Cir. 1957), revg. on another issue T.C. Memo. 1956-82; Magic Mart, Inc. v. Commissioner,51 T.C. 775, 794 (19695. He contends, however, that replacement of buildings and equipment destroyed by fire was a remote and unrealistic contingency because Wilcox had no legal responsibility to replace such property and had never had a significant fire in its facilities. Further, he argues that, since Wilcox had no reserve on its books for self-insurance, it did not have a specific and definite plan for self-insurance. Sec. 1.537-1(b)(1), Income Tax Regs. Notwithstanding the fact that Wilcox had never had *477 a significant fire in its facilities, we think the record clearly establishes that the risk of a serious fire was substantial. Nor do we think that the fact that Wilcox did not own its facilities and had no legal obligation to replace them if destroyed is controlling. What is a reasonable accumulation of earnings and profits is a question of fact to be answered on the basis of the practical considerations of operating a business and not on legal technicalities. See Ivan Allen Co. v. United States,422 U.S. at 627. Wilcox could not reasonably expect Orelite to replace its facilities if destroyed. The cost of replacement would be substantially more than Orelite's investment in the facilities. Orelite did not have, and it is questionable whether Orelite could have obtained, the financial resources to rebuild. In contrast, Wilcox would have been unable to continue its operations, if a serious fire had occurred, and it had the financial resources as well as the incentive to rebuild. [17]
*478 Nor do we think that the absence of a reserve on its books indicates that Wilcox had no plan of self-insurance Cf. Smoot Sand & Gravel Corp. v. Commissioner,241 F.2d at 202. Although a corporation's establishment of a reserve is obviously indicative of such a plan, we think a plan on the part of Wilcox can be inferred from its cancelling the bulk of its commercial insurance. As to the amount that constitutes a reasonable accumulation for self-insurance against fire, we found the testimony of Dr. Douglas Olson, petitioners' expert, [18] very persuasive. However, his conclusion that a reserve of $800,000 was necessary was based on the premise that one unit of the facilities was to be insured. In light of the evidence that Wilcox intended to expand and perhaps relocate (see Pp. 11-12, supra) and the fact it did not own its present facilities, we are not satisfied that Wilcox would have rebuilt if an entire unit were destroyed.Rather, we think that, if one unit had been substantially destroyed, Wilcox would at that point have made a decision to rebuild and expand either at its present location or a new location (in which case it could have used its reserve *479 for relocation and expansion, see pp. 52-55, infra). Taking into account this element of overlap and considering all the evidence, we conclude that a reserve of $500,000 was reasonable for fire protection. [19]
Relocation and expansion. In his statutory notice of *480 deficiency respondent allowed Wilcox a reserve of $600,000 for expansion of plant and machinery. In his Amendment to Answer he allowed no reserve for this purpose. He has assumed the burden of proof with respect to Wilcox' need for less than $600,000 for relocation and expansion. See also Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent contends that Wilcox' plans for relocation and expansion were not sufficiently specific and definite to jusitfy any accumulation of earnings and profits for this purpose. The reasonable needs of the business for purposes of the accumulated earnings tax include "the reasonably anticipated needs of the business." Section 537(a)(1). However, to justify such an accumulation the corporation must have "specific, definite, and feasible plans." Sec. 1.537-1(b), Income Tax Regs. "[Meticulously] drawn, formal blueprints for action" are not necessary but it must be shown that the contemplated expansion was "a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations of surplus." See Smoot Sand & Gravel Corporation v. Commissioner,274 F. 2d 495, 499 (4th Cir. 1960), *481 affg. T.C. Memo. 1958-221; Faber Cement Block Co. v. Commissioner,50 T.C. at 332-333. An important consideration is whether actual steps were taken to implement the plan. Motor Fuel Carriers, Inc. v. Commissioner,supra;F.E. Watkins Motor Co. v. Commissioner,31 T.C. 288 (1958). The record shows that Wilcox' facilities were inadequate, that relocation outside of West Virginia was considered desirable for tax and labor reasons, that the situation was discussed, that the shareholders resolved to set up a reserve for this purpose, and that attempts were made to secure a new site. We are mindful place (see sec. 1.537-1(b)(2), Income Tax Regs.) but we think that the uncertainty as to the company's future created by passage of the Mine Safety Act on December 30, 1969, and the depletion of Wilcox' cash reserves by redemption of T.G. Todd's and his mother's stock explains the failure of the Company to implement its original plan. We are satisfied, however, that such a plan did exist as early as the first year at issue and that such a plan, while pehaps held in abeyance after passage of the Mine Safety Act, was not abandoned *482 during the years at issue.[20]
Nor do we agree with respondent that Orelite's construction of a new machine shop at Wilcox' request indicates Wilcox did not intend to relocate. The expenditure of $100,000 for a new machine shop was minor compared to the amount expected to be spent on a new plant and was a measure taken to meet immediate needs. Moreover, Orelite would presumably attempt to rent its facilities to another business if Wilcox relocated so the investment would not be lost.[21]
On the other hand, we cannot agree with Wilcox that $3,000,000 was a reasonable accumulation for relocation and expansion.Although the corporate minutes stated that $3,000,000 was to be set aside for relocation and expansion, A. G. Wilcox, Jr., testified that about $2,000,000 would be necessary, and the appraised value *483 of the land, buildings, and equipment in Raleigh in 1974 was only $1,096,815. [22]
Although the record herein is deficient in some respects, we are satisfied that respondent has not carried his burden of proof that less than $600,000 was needed to finance Wilcox' contemplated relocation and expansion. Indeed, if we were required to do so (see table p. 58, infra) and bearing heavily upon petitioners who have the burden of proof as to any amount in excess of that figure, we would conclude that a reserve of at least $1,000,000 would be justified. [23]
Self-insurance against product liability. In his statutory notice of deficiency, respondent allowed $100,000 *484 for self-insurance against product liability but allowed no reserve in his Amendment to Answer. Here again, respondent has assumed the burden of proof with respect to a reserve in a lesser amount. See also Rule 142(a), Tax Court Rules of Practice and Procedure. Respondent contends that Wilcox had no specific plan regarding self-insurance against product liability or, in the alternative, that if Wilcox had such a plan, $40,000 was a reasonable reserve. While we agree with respondent that there is no evidence of a plan to self-insure against product liability claims in general, we think that the possibility of liability arising from the two suits pending during the years at issue was a contingency for which Wilcox reasonably accumulated earnings and profits. [24] As to the amount of a reasonable reserve, we reject respondent's approach which would have us limit the amount to that which hindsight tells us was Wilcox' actual liability from the two suits pending against it in the years at issue. During the year ending April 30, 1969 only one suit was pending. Taking into account that the plaintiff therein claimed damages in excess of $100,000, and that on May 1971 Wilcox was held *485 liable for $40,000 not including legal fees, we conclude that respondent has failed to carry his burden of proof that a reasonable accumulation for this purpose should be less than $100,000. During the years ending April 30, 1970, and April 30, 1971, an additional suit was pending against Wilcox, claiming damages of $800,000. Although Wilcox was ultimately not held liable, its attorney did advise that it could potentially be held liable for the entire amount. We adopt the conclusion of petitioners' expert that $540,000 was a reasonable reserve to cover the cost associated with an adverse judgment arising from severe injury to a miner and that this would be a reasonable reserve for both suits during the latter two years in issue. Without consideration of other arguments made by Wilcox (e.g., relating to unionization, self-insurance to cover losses of equipment which collateralized installment accounts receivable and from the operation of its airplane), a comparison of its net liquid assets and its reasonable business needs *486 reveals the following: April 30, 1969
April 30, 1970
April 30, 1971
Stipulated net liquid assets
without taking into account
petitioners' reservations
$5,180,906.92
$5,817,095.47
$6,696,447.98 income tax liability inLess
respect of installment accounts'
receivable payable after the
close of fiscal year.
876,716.39
763,714.85
696,771.66
Net liquid assets available
$4,304,190.53
$5,053,380.62
$5,999,676.32
Reasonable business needs
Working capital
$3,120,701.72
$3,511,092.43
$3,248,546.42
Stock redemption
0
0
900,000.00
Fire insurance
500,000.00
500,000.00
500,000.00
Relocation and expansion
600,000.00
600,000.00
600,000.00
Product liability
100,000.00
540,000.00
540,000.00
$4,320,701.72
$5,151,092.43
$5,788,546.42
Excess or (Deficiency)
($16,511.19)
($97,711.81)
$211,129.90
From the foregoing table, it is apparent that the reasonable needs of Wilcox' business exceeded its available net liquid assets for the fiscal years 1969 and 1970 and showed a relatively small excess for fiscal year 1971. But, these calculations do not take into account the need for funds in order to comply with the Mine Safety Act.
*487 The fact of the matter is that, during each of the taxable years at issue, Wilcox faced a pervasive impact on its business from pending mine safety legislation. To be sure, the Mine Safety Act was not enacted until December 30, 1969 -- well after the close of Wilcox' 1969 fiscal year. But, as our findings of fact show, the potential for drastic legislation came to the fore as early as September 1968 when President Johnson recommended such legislation, became a matter of further deep concern as a result of the Farmington mine accident in November 1968, and was the subject of extensive legislative investigation commencing as early as February 1969. Thus, we think it can fairly be said that Wilcox was justified in being concerned about the impact of such legislation prior to the close of its 1969 fiscal year. The Mine Safety Act revolutionized standards in mining equipment and created turmoil in the industry, which lacked the necessary technology to meet the new standards. Wilcox has candidly admitted it could not with certainty estimate the cost of complying with the Act and we must conclude, as respondent contends, that it had no specific and definite plan (see section 1.537-1(b), *488 Income Tax Regs.), with respect to an accumulation for reasonably anticipated future needs. Respondent seeks to minimize the impact of the Mine Safety Act on Wilcox' position by contending that the nature of the impact was so vague and uncertain, especially in light of evidence that the Federal government agency appears to have adopted a cautious and, indeed, lax approach to enforcement during the earlier years, that the usual requirements of specificity and definiteness as to need were not met. We reject respondent's contention. We consider it disingenuous, to say the least, for respondent to seek refuge in attempting to sustain his tax claims by pointing to the likelihood that another Federal government agency would fail to carry out its statutory mandate. While it is true that, during the taxable years at issue, it was virtually impossible to place a dollar amount on the needs anticipated to meet the requirements of the Mine Safety Act, the fact remains that Wilcox (and its successor in interest, Fairchild) spent $623,469.84 and that the expenditure of another $400,000 was anticipated for research and development related to compliance with the Act. These amounts are far from *489 insignificant and far in excess of normal amounts needed for research and development which might well be considered as part of the operating costs to be taken into account in determining Wilcox' working capital needs under the Bardahl formula. In short, considering the testimony of the witnesses regarding the confusion and uncertainty in the mining industry following the passage of the Mine Safety Act, we are satisfied that prudent management on the part of Wilcox justified the retention of a substantial amount (at least $500,000 in each of the taxable years at issue) [25] to meet the requirements of the Mine Safety Act and that under the facts and circumstances herein, including the fact that petitioners have the burden of proof, we should not substitute our judgment for that of the officers and directors of Wilcox. [26] See Henry Van Hummell, Inc. v. Commissioner, 364 F.2d at 749; Atlantic Properties, Inc. v. Commissioner,62 T.C. at 656; Faber Cement Block Co. v. Commissioner,50 T.C. at 329; Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 590 (1965). As we said in Dielectric Materials Co. v. Commissioner,57 T.C. 587, 599 (1972): *490 We think that respondent's divining rod operates with an unnatural precision. *491 We have a less sharply etched perception -- one perhaps more attuned to the real world. * * * See also, Dill Manufacturing Co. v. Commissioner,39 B.T.A. at 1031. We are not unaware of the fact that Wilcox had very substantial amounts of liquid assets on hand at the close of each of the taxable years at issue and that this fact, coupled with the facts that it was a closely held corporation and had no dividend history, create strong suspicions of the proscribed motive of tax avoidance. But, given the situation regarding the split burden of proof and given the evidence of record, which admittedly is not as complete and tidy as it might have been if counsel for the parties had not so often wandered off into the periphery of the factual setting of the case, we are satisfied that, as our calculations show, the reasonable needs of the business substantially exceeded the available net liquid assets.[27] Such being the case, we need not reach the issue of whether the proscribed motive of tax avoidance was present. Faber Cement Block Co. v. Commissioner,supra at 336; Dielectric Materials Co. v. Commissioner,supra at 600. See *492 also United States v. Donruss Company,393 U.S. 297 (1969). Nevertheless, we are constrained to note that, even with the aforementioned state of the record and the fact that petitioners had to contend with the handicap that the principal officer of Wilcox was deceased, and even assuming that there is some margin of error in our calculation of Wilcox' business needs, we would be inclined to hold, on the basis of the record as a whole and the testimony of the witnesses whom we heard and observed, that the proscribed motive did not exist during the taxable years at issue, insofar as Wilcox is concerned. See Bremerton Sun Publishing Co. v. Commissioner,supra at 590. Orelite Manufacturing Company
Respondent determined that Orelite was subject to the accumulated earnings tax for its fiscal years ended July 31, 1969, July 31, 1970, and July 31, 1971.He concedes that Orelite is not a mere holding or investing company within the meaning of section 533(b). Orelite contends that it was necessary for it to accumulate its earnings and profits in order to upgrade *493 the facilities rented to Wilcox, to make modifications in such facilities to assist Wilcox in complying with the Mine Safety Act and to provide against economic vulnerability which resulted from its dependence on Wilcox and Wilcox' dependence on the mining industry.Orelite does not contend that it had a need for working capital. In January 1969, Wilcox requested that Orelite build a new machine shop at an estimated cost of $100,000. During the years at issue, Orelite made capital expenditures with respect to its leased property totaling $185,477.02. Respondent concedes that such amount was spent in response to Wilcox' request for a new machine shop and that Orelite was justified in accumulating earnings and profits for this purpose, at the end of each year in issue, in an amount equal to $185,477.02 less the amount already expended. [28] Thus, Orelite was justified in accumulating the following amounts: *494 7/31/69
7/31/70
7/31/71
Total Need
$185,477.02
$185,477.02
$185,477.02
Less cumulative
amount expended
14,920.00
55,095.48
185,477.02
Reasonable need
at end of year
$170,557.02
$130,381.54
0
The new machine shop was completed in fiscal year 1971. Although Orelite made expenditures of $2,496.35 and $78,678.96 in fiscal years 1972 and 1973, respectively, there is no evidence that such expenditures were anticipated during the years at issue. Thus, Orelite is not entitled to an allowance for upgrading the property leased to Wilcox in excess of the amounts conceded by respondent. As to Orelite's other claims, there is not a shred of evidence to support its position. While the record is replete with evidence of Wilcox' concern over the effect of the Mine Safety Act and its subsequent expenditures to bring its machinery into compliance, there is no suggestion that Wilcox expected assistance from Orelite, that Orelite anticipated such a request from Wilcox or that Orelite ever spent one cent as a result of the passage of the Mine Safety Act. Nor does the record contain any probative evidence that Wilcox, at any time during the taxable years *495 at issue, otherwise looked to Orelite's earnings and profits or net liquid assets as a source of funds to meet Wilcox' business needs. Cf. Inland Terminals, Inc. v. United States,477 F.2d 836 (4th Cir. 1973). With respect to Orelite's claim of economic vulnerability, the record is equally barren. There is no evidence that Wilcox was subject to cyclical variations (as claimed in its statement submitted under section 534(c)) [29] or that Orelite had any intention of reserving funds for this purpose. A comparison of Orelite's net liquid assets and reasonable business needs shows that it accumulated its earnings and profits beyond its reasonable needs in the years ending July 31, 1970 and July 31, 1971, but not in the year ending July 31, 1969: 7/31/69
7/31/70
7/31/71
Net liquid assets
$169,787.85
$217,187.79
$198,631.72
Less: reasonable needs
170,557.02
130,381.54
0
Excess (deficiency) $ ($769.17)
$ 86,806.25
$198,631.72
Having determined that *496 Orelite had unjustified accumulations of earnings and profits in the latter two years at issue, we turn to consider whether Orelite retained its earnings and profits "for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation." See section 532(a). Initially, we note that on July 31, 1971, Wilcox was the sole shareholder of Orelite.Since only 15 percent of dividends payable to a corporate shareholder were taxable during that year, it is arguable whether the proscribed tax avoidance motive can exist as to such a shareholder. See section 243. The statutory language of section 532(a), however, which was first added by the Revenue Act of 1934, section 102 (Pub. L. 73-216, 48 Stat. 680, 702), specifically includes "the shareholders of any other corporation" and this language is intended to permit reference to shareholders of a parent corporation when a subsidiary's tax avoidance motive is at issue. H. Rept. 704, 73d Cong., 2d Sess. 12 (1934), 1939-1 (Part 2) C.B. 554. See section 1.532-1(2), Income Tax Regs.; Hedberg-Freidheim Cont. Co. v. Commissioner,251 F.2d 839 (8th Cir. 1958). Compare Inland Terminals, Inc. v. United States,supra. *497 Section 533(a) provides that the fact that a corporation accumulates its earnings and profits beyond its reasonable needs shall be determinative of the purpose to avoid the income tax with respect to its shareholders unless the corporation proves to the contrary by a preponderance of the evidence. Orelite has presented no evidence to rebut this presumption or argued on brief that it had no tax avoidance motive. See United States v. Donruss Company,supra (tax avoidance need be only one of the corporation's motives). Moreover, there are several factors which, absent countervailing evidence, are indicative of a tax avoidance motive, the most important of which are failure to pay dividends for fifteen years and investments in bonds unrelated to Orelite's business.See section 1.533-1(a)(2), Income Tax Regs. Given the sparse record and the presumption created by section 533(a), we conclude that Orelite accumulated its earnings and profits for the purpose of avoiding the income tax on its shareholders in the year ending July 31, 1970, and on Wilcox' shareholders in the year ending July 31, 1971. [30]
*498 Decisions will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Interral Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. Both Todd and A. G. Wilcox, Jr. had interests in royalty arrangements with Wilcox (see pp. 6-7, infra↩) which were dealt with separately at the time of the redemption of their shares but the details of such separate treatment is not material herein.
3. During the period May 1, 1968, through April 30, 1972, Wilcox maintained $5,000 fire and extended coverage insurance on machines and tools.↩
4. Pub. L. 91-173, 91st Cong. 1st Sess., 83 Stat. 742. For the legislative history of the Federal Coal Mine Health and Safety Act, see H. Rept. 91-563, 91st Cong., 1st Sess. (1969), reprinted in 1969 U.S. Code Cong. & Adm. News, p. 2503 et seq., and S. Rept. 91-411, 1st Cong., 1st Sess. (1969).↩
1. This apparently deficit figure was stipulated by the parties without explanation. ↩
2. The installment accounts receivable have been stipulated at the face value, with the parties reserving the question whether consideration should be given to the potential Federal income tax on unrealized profit and a provision for a bad debt reserve in respect of such accounts receivable. ↩
3. This item reflects only the Federal income tax payable for the current year and not the tax attributable to the deferred portion of the installment accounts receivable. ↩
4. This figure reflects our correction of the parties' arithmetic error in the amount of 5 cents.↩
1. Liabilities do not reflect accrued Federal Income Tax Payable.
[1]↩/ This figure reflects our correction of the parties' error in the amount of 90 cents.
5. These figures reflect the fact that Wilcox paid $46,424.07 in income tax deficiencies in the year ending April 30, 1969, but relating to prior years, and received a refund of $5,795.33 and paid a penalty of $12.00 in the year ended April 30, 1970.Such facts are not reflected in the profit and loss statements, p. 24, supra↩.
6. The record does not reveal who were the directors of Orelite during this period.↩
7. Petitioners herein filed statements, pursuant to section 534(c), as to the claimed reasonable needs of their businesses, which the Court ruled, prior to trial, were insufficient to shift the burden of proof as to those needs.Thus, the burden of proof as to business needs remains with petitioners, except to the extent that respondent by way of amendment to his answer, filed at the time of trial, alleged that certain business needs were in lesser amounts than those allowed in the deficiency notice; as to those lesser amounts, respondent at the trial assumed the burden of proof. See also Rule 142(a), Rules of Practice and Procedure of this Court. With respect to the proscribed purpose (see section 532(a)), the burden of proof, in all events, remains on the petitioners. See Sandy Estate Co. v. Commissioner,43 T.C. 361, 373-374↩ (1964).
8. See Bardahl Manufacturing Corp. v. Commissioner,T.C. Memo. 1965-200↩.
9. Petitioner does not argue that accounts receivable should not be included at all in computing available funds. For a discussion of this point, see Ziegler, "The 'New' Accumulated Earnings Tax: A Survey of Recent Developments," 22 Tax L. Rev. 77, 83-102↩ (1966).We note that the amount available for meeting the reasonable needs of the business does not always coincide with the amount available for distribution to shareholders. For example, assume a corporation has liquid assets consisting of cash of $100, securities valued at $100 and accounts receivable of $300. Further assume that it has no liabilities and that its only reasonable business need is working capital of $200. Although the corporation's accumulations available for meeting its reasonable business needs exceed such needs by $300, only $200 (cash and securities) is available for distribution to shareholders. However, if accounts receivable were not included in liquid assets for purposes of determining whether the corporation had accumulated earnings and profits beyond its reasonable needs, it would appear that it was not in a position to make any distribution at all.
10. In Bardahl, we stated: We have eliminated from our computation of funds necessary for petitioner's operating costs for one operating cycle any consideration of its anticipated Federal income taxes for the following year since this is not the kind of operating expense for which cash is needed in advance. Federal income taxes would be incurred in the following year only if there arises sufficient earnings from profitable future operations to require their imposition. We note that this statement was made with reference to taxable years prior to the time when corporations were required to make payments of estimated taxes on a current basis and that its applicability to the years subsequent to the first year when estimated taxes first become payable by corporations may be open to question. See Comment, Accumulated Earnings Tax: An Appeal for Flexibility, 52 N.C. L. Rev. 1179, 1215↩ (1974). 11. In point of fact, the parties in that case agreed that a reduction for anticipated taxes was in order. See Ivan Allen Co. v. United States,422 U.S. 617, 622↩, n.5 (1975). 12. Moreover, we note that the decisions of this Court and the Court of Appeals in Golconda Mining Corp. v. Commissioner,58 T.C. 736 (1972), revd. 507 F.2d 594 (9th Cir. 1974), preceded the Supreme Court's decision in Ivan Allen Co. v. United States,supra,↩ footnote 11. 13. We do not construe the exclusion of inventory and accounts receivable from the reasoning in Ivan Allen Co. v. United States, supra↩ at 629, n.9, militating against this conclusion. In our opinion, the Supreme Court at that point was simply leaving to another day the different and more difficult problem of valuing these types of current assets.
14. See also Farmers and Merchants Investment Co. v. Commissioner,T.C. Memo. 1970-161↩.
15. See e.g. Steelmasters, Inc. v. Commissioner,T.C. Memo. 1976-324↩. 16. That Wilcox was not required to pay, and did not pay, the full purchase price in cash is not significant; an accumulation to pay debts falling due in future years is reasonable. See Gazette Telegraph Co. v. Commissioner,19 T.C. 692, 707 (1953), affd. on other issues, 209 F.2d 926↩ (10th Cir. 1954).
17. We note that, as we view the facts herein, Wilcox was not accumulating its earnings and profits to meet the needs of another business, i.e., Orelite. See Latchis Theatres of Keene, Inc. v. Commissioner,19 T.C. 1054, 1060-61 (1953), affd. 214 F. 2d 834 (1st Cir. 1954); Stanton Corporation v. Commissioner,44 B.T.A. 56, 80 (1941), affd. per curiam 138 F. 2d 512 (2d Cir. 1943). Rather, since Orelite made no provision for insurance, Wilcox' own business needs required that it make such provision in order to assure continued production in the event of a casualty. As to fiscal year 1971, when Wilcox owned Orelite, the distinction is unimportant. See section 1.537-3(b), Income Tax Regs.↩
18. Respondent takes the position that Dr. Olson's testimony should be accorded no evidentiary value because it was based on an appraisal which was admitted in evidence only as an attachment to Dr. Olson's report. We think that appraisals such as that relied on by Dr. Olson are "reasonably relied upon by experts" on insurance in forming opinions or inferences and, therefore, need not be admissible in evidence. See Rule 703, Federal Rules of Evidence.↩ Moreover, we note that respondent was aware of the Court's ruling before the last day of trial and was specifically advised by the Court to call the appraiser himself if he thought that questioning him was necessary. 19. Even if we were to take a view of the record more favorable to respondent, we would be unable to conclude that he had carried his↩ burden of proof that less than $450,000 was needed for this purpose.
20. Compare Vulcan Steam Forging Co. v. Commissioner,T.C. Memo. 1976-29↩ (no accumulation justified after plan abandoned).
21. Wilcox has claimed that the cost of constructing the new machine shop was a reasonable need of Wilcox. The shop was, however, constructed by Orelite and there is no evidence that Wilcox ever considered bearing the cost itself.↩
22. Formal resolutions do not per se substantiate a corporate objective to expand its business. American Metal Products Corporation v. Commissioner,287 F.2d 860, 864 (8th Cir. 1961), affg. 34 T.C. 89↩ (1960).
23. In reaching this conclusion, we would take into account the fact that Orelite owned the Raleigh plant and equipment and that, therefore, Wilcox would not be able to finance its relocation and expansion in part by the proceeds of a sale of Orelite's property at Raleigh.↩
24. Cf. Steelmasters, Inc. v. Commissioner,supra;Freedom Newspapers, Inc. v. Commissioner,T.C. Memo. 1965-248↩.
25. This amount substantially increases the deficit in liquidity for fiscal years 1969 and 1970 and exceeds by a wide margin the liquidity surplus for fiscal 1971. See p. 58, supra. That situation would remain even if we were to reduce the $500,000 reserve by the amounts actually expended by Wilcox to comply with the Mine Safety Act in fiscal 1970 and 1971 (see p. 18, supra↩) on the ground that they have presumably been taken into account in computing working capital needs. 26. We were unimpressed with the testimony of respondent's expert, a university business school professor, whose cash flow analysis was designed to convince us that we should defer to his judgment as to Wilcox' liquidity rather than discharge our judicial function to make our own analysis. We also question whether such "academic expertise" should, in any case, constitute a sounder basis for judging the reasonable needs of the business than the judgment of businessmen who stand daily on the firing line of the business actually involved. Compare Moore v. Commissioner,↩ 71 T.C.     (Jan. 11, 1979).
27. Cf. Ted Bates & Co. v. Commissioner,T.C. Memo. 1965-251↩.
28. Respondent rounded the total to $185,000. We have used the exact amount expended but this does not affect the outcome herein.We note that Orelite did not commence design of the new machine shop until late 1969 and, thus, amounts expended in fiscal 1969 were presumably not related to that shop. In view of respondent's concession, this does not affect the outcome, however, since the aggregate amounts expended in fiscal 1970 and 1971 are greater than Orelite's net liquid assets on July 31, 1969.↩
29. Prior to trial, the Court ruled that none of the grounds set forth in such statement were sufficient to shift the burden of proof to respondent. See footnote 7, supra.↩
30. Since Orelite had accumulated earnings and profits of $368,531.43 and $450,102.13 as of the taxable years ending July 31, 1970, and July 31, 1971, respectively, it is not entitled to any minimum accumulated earnings credit under section 535(c)(2).↩