**GROB, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 80–C–1115.

United States District Court,
E.D. Wisconsin.

April 28, 1983.

Robert L. Feind, Jr., Houseman, Feind & Castner, Grafton, Wis., for plaintiff.

Jeffrey D. Snow, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, District Judge.

### I. STATEMENT OF CASE

This is an action under 28 U.S.C. § 1346(a)(1) wherein plaintiff, a machine tool company, seeks a refund with respect to assessments made by the Internal Revenue Service against the plaintiff for allegedly unreasonable accumulation of earnings and profits. The IRS assessed penalty taxes of $96,022 for plaintiff's fiscal year ending September 30, 1976, and $141,-

562.20 [1] for its fiscal year ending September 30, 1977. Plaintiff paid under protest and brought this action.

The matter was tried to the Court on June 3, 1982. At trial, the parties stipulated to certain uncontested facts and various modifications thereto and corrections as well as the admissibility of plaintiff's exhibits 1–50 and defendant's exhibits A–R, although each side reserved the right to object to the relevancy of exhibits in post trial briefs. Each party did submit a post trial brief and proposed findings. The following constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## II. BACKGROUND

1. Grob, Inc. is a vigorous and financially healthy closely held corporation located in Grafton, Wisconsin. Its president and chief executive officer, Ben Grob, is 82 years of age but, to all appearances, remains as the active dominant force in the company's affairs. He was born in Switzerland in 1900, was trained there in engineering, and immigrated to the United States during the 1920's. In 1929, Ben Grob and his brother, Ted, started a tool and die business as partners. The firm survived the Depression, moving to Grafton in 1936. In 1953, the partnership was dissolved and Grob, Inc. was formed. At that time, the company manufactured band saws and continuous filing machines in a plant of 33,000 square feet.

2. In 1957, the company began production of gear rolling machines as well as its other products. The manufacture of both "hot" (extremely high speed saws for cutting hardened materials) and "cold" (conventional) metal band saws continues, but most of the firm's growth has been in the area of gears and gear rolling machines. In 1960, the firm expanded to 66,000 square feet; in 1981 to 96,000 square feet.

3. Grob, Inc. produces gear rolling machines both for resale and for its own production runs of gears. It also produces various miscellaneous products, such as surgical nails, and does custom machine work on stock belonging to others. Ben Grob is an inventor and holds a number of patents in the machine tool field. He is also the primary sales entity in the firm as there has never been a formal sales or promotional unit. As the administrator, inventor, salesman, and the individual who makes all financial and production decisions, there is no doubt that Ben Grob is a "key-man" as that term is commonly understood. He is a remarkably active octogenarian, and "his" corporation is run in a ruggedly paternalistic fashion.

4. One of Ben Grob's patents related to a so-called "splinescope" intended to serve as a substitute for the drive shaft of rear wheel drive automobiles. During the early and mid-70's the company had great hopes for this blossoming into a tremendous business for the firm; and some expansion plans, discussed elsewhere in these findings, were based, in part, on "splinescope" expectations. Unfortunately, the device was never accepted by the American automobile industry and was subjected, according to plaintiff's testimony, to a boycott such that it never developed into the bonanza hoped for. The only market for splinescopes existing now apparently relates to heavy duty trucks and vehicles. In FY 1976–77, splinescopes represented only one-third of one percent of total sales. Sale of heat exchangers constituted ten to fifteen percent of sales during the same period.

5. The company is managed very conservatively. Some of the management and engineering functions are delegated but, as indicated above, Ben Grob does most of the

---

1. The plaintiff's complaint sought a refund for FY 77 of $143,403. Corrections in plaintiff's trial brief indicate that Grob had previously made an overpayment of $1,840.80, which was subtracted from this to arrive at the figure of $141,562.20 set forth in the statement of the case. It was not disputed by the Government that Grob, Inc. was entitled to the $1,840.80—or at least the credit for it. Accordingly, the Court's judgment is in the principal amount of $96,022.00 for FY 76 and $143,403 ($141,562.20 plus $1,840.80) for FY 77, making a total of $239,425.00, plus interest and costs.

running of the firm. Employees, who are called "associates" are non-union, long term, highly-skilled craftsmen. There are 75 to 80 full-time employees. The company originally had a retirement plan but then made a conscious decision to go, instead, to a regular annual bonus plan such that now, and during the time pertinent, the managers and foremen arrive at an allotment to each department and each employee. Mr. Grob then passes on the bonus and sometimes increases, but never decreases, the bonus to an individual. Ben Grob testified that the firm distributed $255,000 in bonus money in 1976 and $225,000 in 1977. A unique aspect of the company is the complete absence of long-term corporate debt and an on-going policy of trying to anticipate and fund corporate needs out of current earnings. During the years in issue, there were no restrictions upon retained earnings and in these same years—and apparently all other years—it paid no dividends to its shareholders.

6. During the pertinent years, Grob, Inc. had 75,000 shares of Class A common voting stock authorized. Of these, 53,774 were issued. Ben Grob owned 23,745 shares and, by written proxy, voted 24,529 shares on behalf of his three children Karl, Lore, and Renatte.

Mr. Grob's wife, Erica, owned 4,700 shares and Albert Reimer, Vice-President owned 800 shares. There were 300,000 shares of Class B, non-voting stock authorized with 211,096 issued. The board of directors consisted of Ben Grob, Erica Grob and Albert Reimer. Officers were Ben Grob, Albert Reimer and Erica Grob. Testimony indicated the board meets very infrequently—just enough to satisfy the statutory requirements.

7. The machine tool industry existing as it does at the base of the productive structure, is highly sensitive to fluctuations of the economy. The normal result of this condition is highly cyclical employment for workers. It is this company's practice to avoid layoffs if humanly possible. When external business is down, the company produces replacement machine tools to modern-ize and update its own productive facilities. In times of heavy machinery orders, the company returns to production runs without having to rehire and retrain its highly-skilled work force.

8. The machine tool industry, in addition to being highly cyclical, is undergoing a technological revolution with the advent of tape controlled and computer controlled machinery. Mr. Grob testified to the company being subjected to what he called the "children of the shoemaker" effect—that, during the busy 1970's, Grob's production of new, automated gear rolling machines was gobbled up by industrial customers while Grob, Inc. was making production runs of the new sophisticated machines with tooling machines that were, themselves, badly outdated.

9. Both the machines used by Grob, Inc. to manufacture its products and the machines it produces are complex and subject to technological obsolescence. They are expensive and often times require long periods of time for manufacture. This results in highly variable income from sales, as large and costly machines are shipped. The company's inventory is, likewise, variable; the result of irregular purchases of large quantities of steel.

### III. THE BARDAHL FORMULA

The sole issue presented for decision is whether Grob, Inc. was availed of during FY 1976 and FY 1977 for the purpose of avoiding the imposition of individual income tax on its shareholders, most especially its president Ben Grob, by permitting its earnings and profits to be accumulated instead of being distributed in the form of dividends.

Sections 531 and 532 of the Code impose an accumulated earnings tax upon corporations availed of for the purpose of avoiding the income tax with respect to their shareholders by permitting earnings and profits to accumulate rather than being divided or distributed.

■ Section 533(a) provides that the fact that the earnings and profits of a corpora-

tion are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to the shareholders unless the corporation, by a preponderance of the evidence, shall prove to the contrary. Thus, the burden is on the taxpayer to prove that, with respect to its fiscal years 1976 and 1977, either (1) that there was no intent to avoid income taxes at the shareholder level, or (2) that the corporation's accumulation of earnings and profits did not exceed the reasonable needs of the business. The corporation's fiscal year runs from October 1 to September 30. Therefore, FY 1976 was from October 1, 1975, to September 30, 1976; FY 1977 ran from October 1, 1976 to September 30, 1977.

In their briefs and arguments to the Court, both sides concur on the applicability of the general analysis used by the Court in *Bardahl International Corp.*, 25 T.C. 935 (1966) and *Bardahl Manufacturing Corp.*, 24 T.C. 1030 (1965), although there is some disagreement on how to calculate specific terms in the formula. In his approach to the question of whether or not there were unreasonable accumulated earnings, Judge Withey set out on page 1042 of *Bardahl Manufacturing* a table that gives rise to a so-called "formula." This formula is given expression in Attachment A.

The formula represents a procedure for arriving at working capital needs by calculating the requirements of capital funds for one "operating cycle" of a business entity. One operating cycle is the length of time (usually expressed as a percentage of a year) it takes to purchase raw materials inventory, process those raw materials into finished goods, sell the finished product, and turn any accounts receivable into cash so that the process may be repeated. Hence, the ultimate percentage which represents this cycle must speak to the turnover time of raw materials, accounts receivable, and any credit cycle. The time it takes to turn over inventory can be computed by dividing either the highest or the average inventory for the year by the costs of the goods sold in that year. This results in a percentage of a year. In similar fashion, the time it takes to turn over a receivable account is computed by dividing the highest receivables for the year by the sales for that year. This likewise is expressed as a percentage of a year. Adding inventory cycle to receivables cycle, one arrives at a theoretical time period, again expressed as a percentage of a year, that is required for the total productive process.

The *Bardahl International* case took the additional step of recognizing that those who supply raw materials and labor are not paid immediately. An appropriate credit period, usually 15 or 30 days, is stated as a percentage of a year (divided by 365 days per year), and this is subtracted from the total of the inventory and receivables percentages. When this ultimate percentage rate is applied to the net operating expenses for the year, the result represents the expenses for one business operating cycle (Column 4 of Attachment A). To this are added reasonably anticipated extraordinary expenses during the tax year in question (Column 5 of Attachment A). The sum represents the total requirements of the firm for liquid assets (Column 6). This is contrasted against the sum of liquid assets such as cash and equivalents (Column 3) and investments which can be converted into cash readily if necessary (Column 8) in order to ascertain whether there is an excess or shortage of available capital (Column 7). Cognizance must also be taken of any loans unrelated to the business (Column 9).

The result of this whole process is a figure (Column 10) indicating how much the subject firm has accumulated beyond its reasonable needs. This, in conjunction with its findings on the intent of the parties, should permit a factfinder to ascertain whether or not the corporate entity has been availed of for the purpose of avoiding income tax by one or more of the shareholders. The Court has utilized this approach and attaches hereto a table that summarizes its findings. Some of the entries in the table (Attachment A), as it applies to this case, have been stipulated between the parties.

The analysis begins by establishing the accumulated earnings and profits for the years in question (Column 1) and the amounts by which the earnings and profits increase over prior years (Column 2). Here the parties agree that the accumulated earnings in FY 1975 were $1,303,307; in FY 1976 $1,572,364; and in FY 1977, $2,022,647. The increase in accumulated earnings were stipulated at $269,057 (FY 1976) and $450,-283 (FY 1977).

Beginning with Column 3, we move into the formula itself. It becomes necessary to first ascertain the amount of net liquid assets available to Grob at the close of each of the years in question so as to determine whether it had sufficient liquid funds to meet its reasonably anticipated business needs and still permit the distribution of dividends to shareholders. *Gus Blass Co.,* 9 T.C. 15 (1947). This requires looking at cash and items representing the equivalent of cash such as treasury bills and government securities. Here again, the parties have stipulated this amount to be $418,798 (FY 1976) and $539,702 (FY 1977).

The controversy in this case commences when we reach Column 4 (Ordinary Operating Expenses for one business cycle) and Column 5 (Anticipated Extraordinary Expenses). Since each of these factors contains a number of sub-elements upon which there is sharp divergence of opinion, the Court will discuss each component separately and outline the computation of Ordinary Operating Expenses in Attachments B–1 and B–2; the constituent elements in Anticipated Extraordinary Expenses in Attachment C.

## COLUMN 4
## (ORDINARY OPERATING EXPENSES FOR ONE BUSINESS CYCLE)

### A. *Inventory Turnover Cycle*

In seeking the plaintiff's legitimate working capital needs, the Court meets the first point of contention in calculating the inventory turnover cycle. The Government determined an average inventory (actually obtained by adding the beginning and ending inventory and dividing by 2) by the cost of goods sold. Hence, for FY 1976, it arrived at:

$$\frac{389,171 + 327,400}{2} \quad \text{or} \quad \frac{358,286 \text{ (average inventory)}}{1,804,669 \text{ (cost of goods sold)}}$$

or 19.85% of a year as the inventory cycle for FY 76 and:

$$\frac{327,400 + 411,825}{2} \quad \text{or} \quad \frac{369,613 \text{ (average inventory)}}{2,305,328 \text{ (cost of goods sold)}}$$

or 16.03% of a year as the inventory cycle in FY 77.

This was the Government's position at the time of the Final Pretrial Report (¶ 14). Then, in defendant's exhibit P, the Government's revised Bardahl formula, the Government accepted the plaintiff's recommendation that the higher of either the beginning or the ending inventory figures be used. This results in:

$$\frac{389,171}{1,804,669}$$

or 21.56% of a year as the inventory cycle in FY 76; and

$$\frac{411,825}{2,305,328}$$

or 17.86% of a year as the inventory cycle in FY 77.

### B. *Receivables Turnover Cycle*

In calculating the receivables turnover cycle, the differences from the use of peak or average receivables are greater than the differences for inventory. Here, the Government arrived at an average accounts receivable and divided it by the net sales for the year for a receivables turnover cycle of 7.28% in FY 76 and 8.37% in FY 77. Plaintiff used peak accounts receivable (Nov. of '75 for FY 76/Aug. of '77 for FY 77) and divided it by the net sales for the year to arrive at a receivables turnover cycle of 14.99% in FY 76 and 16.00% in FY 77. With regard to this calculation, the Government seems to have again accepted plaintiff's position in defendant's exhibit P although it is there noted:

Corporations Receivable figures are unaudited and it is not known if these "peak" selections contain any extraordinary items not normally considered a true trade receivable.

Because of the Government's seeming acquiescence in the use of "peak" inventory and receivables amounts, because the testimony has convinced the Court that the business of plaintiff is, indeed, subject to substantial fluctuations in sales (see Plaintiff's Exhibit 18) even though the company retains its "associates" in slack times thus helping to hold skilled help and also smooth out labor costs; and because other courts have seen fit to utilize "peak" cycles in cases with similar kinds of taxpayers (*Alma Piston Co.,* 35 T.C.M. 464 (1976); *Kingsberry Investments, Inc.,* 28 T.C.M. 1082 (1969), this Court will utilize "peak" data for both fiscal years in its independent calculation of working capital needs.

Dividing the peak receivables by net sales for the year results in a receivables turnover cycle for FY 76 of 14.99% and for FY 77 of 16.00%. When the inventory turnover cycle for each year is added to the receivables turnover cycle for that year, we arrive at the theoretical time period, expressed in a percentage of a year, which is required to transform raw materials into finished machines, to sell the product and turn those sales into cash in hand. This theoretical figure for FY 76 is 36.55% and for FY 77 is 33.86%.

### C. *Credit Cycle*

██ Those sources from which a corporation acquires its inventory and its labor do not get paid immediately. To the extent that such payments are delayed there should be some reduction in the cycle, since to this extent the taxpayer is operating on somebody else's money and does not need to utilize his own working capital. The *Bardahl International* case recognized this credit factor as a necessary addition to the basic formula. In its original working capital calculations, the Government utilized a 15-day period. So, also, did the plaintiff. At the trial, a dispute developed because Mr. Grob testified that whereas Grob, Inc. had formerly paid all invoices early to obtain the customary trade 10-day discount, the inflationary price increases of recent years and the extraordinary cost of working capital were such that it had sometimes begun not paying its steel purchase invoices for periods of up to thirty days. He felt that sometimes the additional working capital was worth more than the loss of the discount. However, the evidence was unclear as to precisely when this practice had crept into being and how consistently it was followed. Plaintiff argues that the largest component of the average credit period is labor, particularly in a business that is partially service (doing machining on customers' stock [Grob testified such service work accounted for 15% of plaintiff's sales]). The argument is advanced that workers paid on a bi-weekly basis (14 days after the pay period begins) extend credit for an average of seven days. Plaintiff also contends that the Government, as it shifts from a 15-day to a 30-day calculation, ignores that in FY 76 and FY 77, certain invoices were paid immediately because they were due on receipt or paid within less than fifteen days in order to qualify for the usual discount.

This Court finds plaintiff's contentions persuasive; particularly when coupled with the fact that in the stipulation of uncontested facts in the Final Pretrial Report, the Government calculated working capital needs on the basis of a 15-day average credit period. Hence, when this is divided by 365 days, the appropriate reduction to arrive at the business operating cycle is 4.11%. When 4.11% is subtracted from 36.55% (FY 76) and 33.86% (FY 77) we arrive at net business operating cycles of 32.44% and 29.75% for each of the two years. Applying this cycle figure against the net adjusted operating expenses for each year, the Court concludes the business cycle operating expenses *to this point* for FY 76 to be $724,738 and for FY 77 to be $771,231. (Attachments B–1 and B–2).

### D. *Inflationary Factor*

██ In initially developing the Bardahl formula Judge Withey was dealing with taxable years 1956, 1958 and 1959. It is understandable that, at that time, no separate allowance was made for the overall impact of inflation upon a corporation's needs for working capital (although the

court there did permit a $100,000 per year "emergency fund" to guarantee the ability to stockpile needed chemicals in the face of "sudden changes in world conditions," *Bardahl Manufacturing, supra,* p. 1045. In the case at bar, plaintiff argues that a 30 percent incremental factor should be added to its working capital needs for each business cycle (Plaintiff's Exhibit 17, p. 2). The Government seems to concur that 1976 and 1977 were years in which a prudent manager would factor inflation into his planning but they allowed 10 percent with the statement "Since no accurate documentation either amount was generated—one guess is as good as another," (Defendant's Exhibit P). The general inflation rate was certainly greater during the years in question than now, but the Court believes the Government's "guess" here to be more realistic than plaintiff's. Accordingly, the operating expenses for one business cycle will be augmented by 10 percent in each of the two fiscal years. This results in a final figure for the Court's entry in Column 4 of Attachment A of $797,212 for FY 76; $848,354 for FY 77.

## COLUMN (5)
## ANTICIPATED EXTRAORDINARY EXPENSES

### A. *General Considerations*

[5, 6] The second area of contention in this case deals with that part of the Bardahl computation which seeks to quantify appropriate amounts to be set aside from accumulated earnings for anticipated extraordinary needs in future years. In considering the reasonableness of a taxpayer's actions in this regard, a fact finder should view the judgments and actions taken from the vantage point of management in the year in question with due regard to the past experiences that taxpayer has had and such tangible requirements as may be foreseen at that time. As plaintiff points out, in accumulated earnings tax matters, what happens *after* the close of the taxable year in issue is not taken into account, except to test the validity of the concerns of the taxpayer when the decisions were made. *Sterling*

*Distributors, Inc. v. United States,* 313 F.2d 803, 807 (5th Cir.1963) and *Smoot Sand v. Commissioner,* 274 F.2d 495, 499 (4th Cir. 1960) *cert. denied* 362 U.S. 976, 80 S.Ct. 1061, 4 L.Ed.2d 1011 (1960). Conversely, what has happened *before* the tax year in question is appropriate for consideration inasmuch as it constitutes the stuff of management's experience.

Much of the contention, of course, deals with how well delineated, how tangible, and how certain these contingencies are. Plaintiffs brief appropriately quotes from *Eberle Tanning Co. v. United States,* 342 F.Supp. 1039, 1042-43 (M.D.Pa.1971):

In order to justify an accumulation of earnings and profits for the reasonably anticipated future needs of the business, a corporation must have had specific, definite and feasible plans at the close of each of the years in issue for use of the earnings retained in the business. However, where the future needs are reasonable and foreseeable, but incapable of definiteness, and where specific plans cannot be made for these needs, other than to conserve a reasonable amount of capital, specific, definite and feasible plans are not so required. Such needs include the foreseeable downswings in a business, threatened and actual strikes, volatile swings in the price of its raw materials and the decreasing market for the company's product. With respect to these needs, it is only necessary that they be reasonably foreseeable.

On the other hand, in considering those needs which were capable of specific determination and definite planning, you must find in determining whether Eberle had a specific, definite and feasible use of accumulated earnings and profits for such needs, that the plans were more than a nebulous desire to meet the problems or requirements of the business. In addition, the plans must be coupled with some action, some contemporaneous course of conduct directed toward the claimed objective. However, a closely held corporation is not held to the same strict formalities as a large publicly held

corporation. The fact that Eberle did not have formal written plans or include references in its corporate minutes to all of its business needs does not preclude you from finding that its retained earnings for such purposes were reasonable if you find that the contingencies were real, continuously present and in the exercise of sound business judgment could not be ignored at the close of each of the years in issue.

■ This Court believes that the judgments as to reasonableness which it must make regarding extraordinary needs must be considered in the light of a small closely held corporation where many of the plans are perforce in the head of the key-man. It does not believe that elaborate and detailed pronouncements at board of directors meetings are a necessity. *Wilcox Manufacturing Co., Inc.,* 38 T.C.M. 378, 396 (1979). Grob, Inc. need not lay the same paper trail that General Motors would to establish the reasonableness of projected needs. This Court would further opine that adherence to a position or figure throughout the litigation is more likely to convince a fact-finder that a parties' position represents reasoned calculation of such needs rather than ex *post facto* scrambling of figures to justify a position.

### B. *Estimated Tax Payments*

■ *Bardahl Manufacturing* was decided in 1965 and Judge Withey excluded from his calculations on the needs for one business cycle any sums for anticipated federal and state income taxes with the statement, "this is not the kind of operating expense for which cash is needed in advance." *Supra* p. 1044. He felt that a corporation incurred such expenses in the following year only if there were sufficient profits to require the tax payments. Now, of course, corporations are required to make current payments of estimated income taxes and the tax court and the IRS now agrees that these are reasonable operating expenses. *Wilcox Manufacturing Co.,* T.C.M. (P–H) ¶ 79,092; *Doug Lang, Inc.,* 72 T.C.M. 158 (1979); *Empire Steel Castings, Inc.,* 33

T.C.M. 155 (1974) and *IRS Manual,* Exhibit 600–2 (1981). Hence, the Court accepts those payments set forth in plaintiff's Exhibit 17, *i.e.,* $143,620—Federal; $28,400—State for FY 1976 and $274,730—Federal; $56,860—State for FY 1977. In making its own computations of the "Bardahl" formula, the Court has, therefore, added $172,020 (FY 1976) and $331,590 (FY 1977) to the net anticipated extraordinary expenses.

### C. *Machinery Replacement*

■ Defendants Exhibit P (prepared from plaintiff's tax returns) shows in its *Comparative Analysis; Selected Items* acquisitions for machinery and equipment as follows:

| | | |
|---|---|---|
| FY 73 | 98,486.46 | |
| FY 74 | 20,210.85 | |
| FY 75 | 201,684.37 | |
| FY 76 | 138,907.80 ] | |
| FY 77 | 87,506.29 ] | at trial |
| FY 78 | 147,160.81 | |
| FY 79 | 132,567.11 | |
| FY 80 | 921,726.87 | |

In the same exhibit (page 2), the government auditor opined that "consideration should be given to allowing a zero amount . . ." but in its revised calculations of April 21, 1982, it did allow $145,000 for FY 76 and $88,000 for FY 77. In plaintiff's Exhibit 19, Grob projected needs of $300,000 for FY 76 and $330,000 for FY 77.

Hence, it would appear that the Government, when making its audit in 1982, essentially allowed as a reserve what the plaintiffs had, in fact, purchased in FY 76 and FY 77. This is hindsight operating! Nor is the Court impressed with the Government's argument that during the audit, Grob, Inc. furnished no data.

The Government's brief argues (pp. 25 and 26) that Government Exhibit E shows no machinery was ordered prior to 1979. The Court cannot accept that contention. It would require ignoring the acquisitions listed in Government Exhibit P enumerated above. It also would require an erroneous construction of Government's Exhibit E. That document is a response from Grob to Revenue's letter of October 5, 1979, advis-

ing that a Notice of Deficiency was under consideration and inviting a response. The Grob response is dated October 11, 1979. It addressed itself to an allegation of accumulating earnings and profits beyond reasonable needs and was, thus, by its very nature, focused on the *future*. There would be no point in including machinery purchased prior to the date of the Notice of Deficiency. To be sure, most of the purchase orders copied in Government's Exhibit E are orders in 1979, but that provides no basis to infer that no machinery had been purchased prior to 1979. Such would belie the Government's own exhibit. The large increase in purchases in FY 80 was apparently timed to provide delivery dates consonant with the last expansion in 1981.

Even though the "splinescope expansion" in Mississippi, discussed below, never developed, the fact is that there was an expansion from 33,000 square feet in 1953 to 66,000 square feet in 1960, and again to 96,000 square feet in 1981. There is little doubt in the Court's view that expansion somewhere, if not in Mississippi, was on the corporate mind of Grob, Inc. during the last half of the decade of the 70's. That expansion was going to require machinery and equipment. With the increasing complexity of tape and computer controlled machines; the long lead time between order and delivery; installation and production; and the fact that $1,334,020 was actually spent on machines in the three years immediately following FY 76 and FY 77, the Court believes that the Government has little rational basis for its projections. The plaintiff's figures, however, also seem to be "plucked out of the air." For lack of a more specific guide, the Court has averaged the purchases from FY 73 thru FY 80 and will allow as reasonable the sum of $218,500 in each fiscal year as a reserve for machinery replacement. Plaintiff's Exhibit 20 gives witness that the kinds of machine tools needed were exceedingly expensive. The years 1975, 1976, 1977 were years of pervasive inflation and this prospect was certainly considered by Grob.

### D. *Reserve for Losses*

In both the defendant's revised audit (Defendant's Exhibit P) and plaintiff's trial presentation (Plaintiff's Exhibit 19), a reserve is set aside for potential or actual lawsuits or money judgments against Grob, Inc. Both sides carried this at $100,000 (FY 76) and $150,000 (FY 77). In its trial brief (p. 25), Grob "does not dispute defendant's estimate in part, because under the next section of extraordinary need, insurance products liability, plaintiff has included the following items: (1) Defense costs, (2) settlement costs, products liability judgments.

The Court feels that this topic is encompassed in the next portion of this opinion and will, hence, not make a separate allowance here.

### E. *Self-Insurance for Products Liability*

Product liability exposure is a part of modern business life. This is particularly true in the case of a manufacturer of machine tool machines and components. As previously noted, part of plaintiff's product line consists of both "cold" (speeds up to 5,000 ft. per min.) metal band saws and "hot" metal band saws. The latter operate at speeds up to 15,000 ft. per min. and run so hot that friction heats the cut metal to a plastic state. They are obviously dangerous instruments which must be carefully guarded and operated.

That plaintiff is entitled to treat as a legitimate business expense its exposure to the perils of products liability judgments is self-evident and recognized by the government, IRC § 537(b)(4). In the usual business, this takes the form of insurance premiums, although many firms today are finding this almost prohibitively expensive. The Secretary of the Treasury has not, as yet, promulgated regulations delineating the above code section. Here, the agent allowed a reserve of $300,000 and $330,000 for the two fiscal years under audit. Plaintiff seeks $1,200,000 and $1,320,000, respectively, for the same periods. The parties stipulated in the final pretrial report that products liability insurance for Grob was not available. This is evident from plaintiff's exhibit 28 and defendant's exhibit B.

Plaintiff's exhibit 27 is a commentary on the availability of products liability protection by William Foran, an insurance consultant approached by plaintiff's counsel in 1981. In that opinion, while he does say that it is difficult to estimate an appropriate reserve figure, Mr. Foran also states:

With verdicts that are being rendered in excess of $1,000,000 regularly, it would not be unreasonable to assume that with the nature of the products manufactured by Grob, Inc. that a claim could be asserted and liability established because of the products, well in excess of $1,000,000.

Mr. Foran also opines that:

for a manufacturer with sales of approximately $4,000,000, it was not uncommon to see insurance premiums quoted at 5% of sales.

However, the net result of his commentary seems to be that Grob should "go bare." This is precisely what plaintiff has done from the beginning. Two default judgments have been rendered against it for $2,000 and $50,000, although no monies have yet been paid on these. Plaintiff follows a policy of resisting all claims. Recently, it was a defendant in a $1,000,000 lawsuit in Michigan. After a two-week trial, Grob, Inc. escaped liability. However, it anticipates attorney's fees and costs of $40,000–$50,000 for that defense.

Grob, Inc. is a high risk entity in the field of products liability and this Court is convinced that it should be able to set aside an adequate reserve. With no IRS regulations and no premium experience, it is extremely difficult to correctly assess what that amount should be. The Court must also be cautious since, by its daily exposure to products liability litigation, it may be unduly sensitive.

Plaintiff's post-trial brief (page 20) urges that the formula used by the government vis-a-vis casualty losses, i.e., 10 times the quoted premium, should be applied here. Mr. Grob estimated products liability insurance, if available, would cost $300,000 to $400,000 per year, although no source is given for this figure. Ten times this figure would result in a reserve of $3–4 million per year. This appears unreasonably large. Defendant offered no rationale for its allowance of $300,000 and $330,000. However, it argued post-trial that since Grob has yet to pay monies out to claimants, the allowance by Agent Marquwardt "should be reduced substantially downward by the Court. This is not persuasive.

Faced with a lack of reasonable cost experience here, the Court, although it realizes full well that Employer's Mutual was not able to find a willing insurer, adopts the statement of Mr. Foran that opines small manufacturers may annually pay 5 percent of sales as premiums. Five percent of gross sales for FY 76 is $135,000; for FY 77 the comparable figure is $163,000. For a self-insurer, multiplying this by ten, as the government suggests regarding casualty losses, results in this Court finding that $1,350,000 (FY 76) and $1,630,000 are reasonable reserves for all product liability exposure as well as the reserve for losses touched on above.

### F. Self-Insurance-Casualty

In 1978, the value of plaintiff's building was estimated at $2,300,000; contents at $8,150,000. Allowing a six-month business interruption loss of $1,500,000, the Employer's Mutual representative postulated a total exposure of $11,950,000, assuming return to full production within six months of a total loss. This was an "all-risk" quote and contrary to plaintiff's assertions (Proposed Findings, p. 15), does include business interruption protections. The annual premium therefor was quoted at $11,880 with a $100,000 deductible amount.

Plaintiff has chosen to be self-insured against general casualty perils. The only regular insurance it purchases is that covering the company's automobiles.

Citing the fact that Grob's facilities are all under one roof, thus increasing the chances of a total loss, the statement by Employer's Mutual that a major loss will occur every 30 years, and relying on the case of *Wilcox Manufacturing Co.*, 38 T.C.M. 378 (1979), wherein a lessee manufacturer was permitted a reserve to 45 per-

cent of appraised value, Grob here contends that its claimed allowance of $550,000 in each of FY 76 and FY 77 is reasonable.

The defendant asserts that Grob has a history of no casualty losses, a tightly disciplined work force that maintains a clean shop, and that the plant is not located in an area subject to tornadoes, high winds, or flooding. The audit agent multiplied the quoted premium by a factor of ten and allowed a reserve of $118,800 (FY 76) and $130,680 (FY 77).

Plaintiff's claimed reserve will permit replacement of a total loss of $11,850,000 ($11,950,000, minus 100,000 deductible) on an accumulation of 21.5 years. Defendant's allowance of $118,800 and $130,680 if averaged to $124,740, would permit replacement of said total loss of $11,850,000, on an accumulation of 94.9 years. The Court considers the Government's allowance unreasonable and plaintiff's mildly excessive. It finds an annual allowance which would permit replacement on a 30-year accumulation, or $395,000 for each year in question, to be reasonable.

### G. Reserve for Self-Insurance-Keyman Replacement

■ It is not argued that insurance arrangements for keyman replacements are not a proper business expense nor that in the case of a self-insurer, a reasonable reserve for this purpose may not properly be treated as an anticipated extraordinary need of the company assuming said reserve does not exceed "the amount that a prudent businessman would consider appropriate for the present business purposes and for the reasonably anticipated future needs of the business." Treas.Reg. § 1.537-1(b).

The parties stipulated as an uncontested fact that Benjamin Grob was, in the relevant period, the plaintiff's keyman, dominant administrator, and in charge of all matters dealing with production and finance.

In 1975, Mr. Grob's salary was $75,000. Subsequently, it escalated substantially:

| | |
|---|---|
| 1976 | $ 85,000 |
| 1977 | $ 95,000 |
| 1978 | $200,000 |
| 1979 | $216,000 |
| 1980 | $260,000 |

Mr. Grob felt that this salary was a matter of "prestige" and plaintiff's counsel argues that it is in line with the salary of a chief executive officer of a multi-million dollar manufacturing and service concern. The Court does not quarrel with this—nor with the assertion that to replace Ben Grob would require hiring more than one person. Grob, Inc. has relied on his engineering, his patents, his managerial expertise, and his salesmanship.

The Government allowed $50,000 in each of the two years as a reserve for keyman replacement. Plaintiff claimed $100,000 and $150,000 for the years in question. Keyman insurance, as the Court understands it, is supposed to provide the wherewithall to cushion the shock of replacing an essential individual who dies or moves out of an organization. Presumably, the replacement or replacements ultimately acquire the capabilities of the replaced party and the firm continues to function. In this regard, it seems to be a different peril than the ongoing need to protect against casualties or product liability. The nature of the risk, while it may exist from time to time, does not appear continuous.

A further consideration is that we are here focusing on FY 76 and FY 77. It is now FY 83 for Grob, Inc. Ben Grob is still going strong; still flies his own airplane; but has moved to Florida and relinquished some of the day-to-day management of the firm. The dire contingency about which we are concerned would appear to be diminishing as more responsibilities are delegated. Hence, although we must look at the issue through the eyes of management *at the time,* it seems to the Court that the Government's allowance was reasonable. Hence, it finds that $50,000 is appropriate as a reserve in FY 76 and FY 77.

H.  *Stock Redemption—Keyman*

*Plant Expansion*

*Market Development-Splinescope*

*New Product Development*

In each of the above categories of possible anticipated needs, plaintiff allocated certain reserves of accumulated profits with the Government making either no allocation therefor or a smaller amount. Those contrasting figures are set forth in Attachment C hereto. Since a calculation of its findings thus far under the Bardahl formula establishes that plaintiff has met its burden of proving that operating expenses for one business cycle and reasonably anticipated extraordinary expenses exceed the funds available in each of the years in question, the Court will not make specific findings in the above four categories.

COLUMNS (6) & (7)

TOTAL NEEDS FOR LIQUID ASSETS AND INVESTMENT IN UNRELATED PROPERTIES

Having arrived at its own findings as to Operating Expenses For One Business Cycle (FY 76—$797,212; FY 77—$848,354) and as to Anticipated Extraordinary Expenses (FY 76—$2,013,500; FY 77—$2,293,-500) the Court, pursuant to the Bardahl concept combines these in Column 6 to produce a figure representing the *Total Needs* in each year for *Liquid Assets,* (FY 76—$2,-810,712; FY 77—$3,141,854). This figure is then contrasted against the *Net Liquid Assets* (Column 3) (which the parties stipulated to) plus available *Investments in Unrelated Properties* (Column 8). In the case at bar, this figure in Column 8 represents the "nest egg" of stocks and securities which . the corporation owns. There was considerable divergence between the parties right up to trial as to how the securities should be valued. In their post trial submissions, however, cognizance was taken of *Ivan Allen Co. v. United States,* 422 U.S. 617, 628, 95 S.Ct. 2501, 2507, 45 L.Ed.2d 435 (1975). There the high Court held that in an accumulated earnings case, securities are to be valued at fair market value less cost of conversion into cash. Consequently, the

parties agreed that the "nest egg" should be valued at $1,351,354 for FY 76 and $1,568,483 for FY 77.

There are no loans unrelated to the business involved in this matter and Column 9 may be disregarded.

The final result of this comparison of Columns 3 and 8 against Column 6 is either an excess or a shortage of working capital requirements. The Court concludes that, in this case, there was a shortfall of $1,040,560 in FY 76 and $1,033,669 in FY 77. Hence, there was no accumulation beyond reasonable needs.

IV.  *Intent*

In order to have an accumulated earnings tax penalty set aside, the taxpayer has the burden of showing that either (1) its accumulations of earnings and profits did not exceed the reasonable needs of the business or, (2) that there was no intent to avail the corporation as a means of avoiding income taxes at the shareholder level, *Gallun & Sons Corp. v. United States,* 510 F.Supp. 630 (1981).

By its findings and computations within the Bardahl framework, the Court has concluded that plaintiff has met its burden under the first alternative. Nonetheless, it believes that certain findings are clear with respect to the issue of intent.

It is true that Grob, Inc. has been an extremely successful company; that it has not declared dividends; that it has accumulated a nice "nest egg" of common stocks (which was treated as available in computing working capital needs under the Bardahl computations); that Mr. Grob's salary has increased a great deal in recent years; and that Ben Grob is and was outspoken in his complaints that he feels he must make his every business decision with a view to its tax impact. However, it is also true that Ben Grob is a strongly opinionated, articulate, and energetic individual with very definite ideas about how a business should be run. He is very conservative in the operation of the company. He prefers that the firm protect itself against the perils of litigation, casualty losses, products

liability and the viscisitudes of business cycles as they impact on sales, prices and employment. None of this is "bad"; none of it is illegal. In fact, it displays a rugged individualism that the Court found admirable and too infrequently encountered these days.

In summary, the Court concludes that (1) Ben Grob was sincere in his desire to maintain reserves sufficient to permit the firm to continue a productive, independent existence; (2) incorporates herein the figures set forth in Attachments A. It finds that plaintiff's reasonable business needs in FY 1976 were such that it had no accumulated taxable income for that year within the meaning of IRC § 535(a); (3) it also finds that plaintiff's reasonable business needs in FY 1977 were such that it had no accumulated taxable income for that year within the meaning of IRC § 535(a); and (4) the Court finds that during its fiscal years 1976 and 1977, plaintiff was not availed of with a purpose or intent to avoid tax at the shareholder level within the meaning of IRC § 532(a).

Accordingly, judgment is rendered in favor of the taxpayer and against the Government for principal sum of $239,425, plus interest and costs pursuant to law.

### "ATTACHMENT A"

### GROB, INC. V. UNITED STATES
#### 80–C–1115

| Year Ending 9–30 | Acc. earnings & profits (1) | Inc. in earn. & profits over prior yrs. (2) | Net liquid assets (3) | Operat.exp. 1 bus. cycle (4) | Antic.extra ord. exp. (5) |
|---|---|---|---|---|---|
| | STIPULATED | STIPULATED | STIPULATED | (ATT. B–1; B–2) | (ATT. C) |
| 1975 .............. | 1,303,307 | --- | --- | --- | --- |
| 1976  P .......... | 1,572,364 | 269,057 | 418,798 | 1,014,703 | 2,600,000 |
|      D .......... | 1,572,364 | 269,057 | 418,798 | 514,287 | 879,820 |
|      CT .......... | 1,572,364 | 269,057 | 418,798 | 797,212 | 2,013,500 |
| 1977  P .......... | 2,022,647 | 450,283 | 539,702 | 1,130,843 | 2,850,000 |
|      D .......... | 2,022,647 | 450,283 | 539,702 | 525,993 | 1,087,200 |
|      CT .......... | 2,022,647 | 450,283 | 539,702 | 848,354 | 2,293,500 |

| | Total needs for liq. assets (6) | Excess–or short–work. cap. (7) | Investment unrel. prop. (8) | Loans unrel. to bus. (9) | Amt. Acc. beyond needs (10) |
|---|---|---|---|---|---|
| | (4&5) | (3&8–6) | STIPULATED | | |
| 1975 .............. | | | | | |
| 1976  P .......... | 3,614,703 | −1,844,551 | 1,351,354 | --- | None |
|      D .......... | 1,222,087 | 548,065 | 1,351,354 | --- | 548,065 |
|      CT .......... | 2,810,712 | −1,040,560 | 1,351,354 | --- | None |
| 1977  P .......... | 3,980,843 | −1,872,658 | 1,568,483 | --- | None |
|      D .......... | 1,563,193 | 544,992 | 1,568,483 | --- | 544,992 |
|      CT .......... | 3,141,854 | −1,033,669 | 1,568,483 | --- | None |

**ATTACHMENT B-1**

COMPUTATION OF BUSINESS OPERATING CYCLE EXPENSES OR CURRENT OPERATING EXPENSES

| | | |
|---|---|---|
| 1. | Net adjusted operating expenses for year | |
| 2. | Cost of goods sold | P 1,804,669 |
| 3. | Operating expenses | P 544,364 |
| 4. | Depreciation | M (114,944) |
| 5. | Net adjusted operating expenses for year | P 2,234,089 |
| 6. | Business operating cycle as expressed as a part of a year | |
| 7. | Inventory turnover cycle | |
| 8. | Cost of goods sold | 1,804,669 |
| 9. | Beginning Inventory | 389,171 |
| 10. | Ending Inventory | 327,400 |
| 11. | Line 9 plus line 10 | 716,571 |
| 12. | Average inventory or line 11/2 | 358,286 |
| | OR | |
| 13. | Inventory in month when sum of inventory and receivables is highest | 389,171 |
| 14. | Inventory turnover cycle or line 12 or 13/line 8 | 21.56 |
| 15. | Receivables turnover cycle | |
| 16. | Net sales for year | 2,703,431 |
| 17. | Beginning accounts receivable | 181,581 |
| 18. | Ending accounts receivable | 212,097 |
| 19. | Line 17 plus line 18 | 393,678 |
| 20. | Average accounts receivable or line 19/2 | 196,839 |
| 21. | OR Nov. 1975 Accounts receivable in month when sum of inventory and receivables is highest | 405,327 |
| 22. | Receivables turnover cycle or line 20 or 21/16 | 14.99% |
| 23. | Line 14 plus line 22 | 36.55% |
| 24. | Average credit period in days extended by suppliers | 15 |
| 25. | Line 24/365 days | 4.11% |
| 26. | Business operating cycle as expressed as a part of a year or line 23 less line 25 | 32.44% |
| 27. | BUSINESS OPERATING CYCLE EXPENSES OR CURRENT OPERATING EXPENSES(Line 5x26) | 724,738 |

COMPUTATION OF AMOUNT ACCUMULATED BEYOND THE REASONABLE NEEDS OF BUSINESS

| | | |
|---|---|---|
| 28. | Current assets | P |
| 29. | Current liabilities | M |
| 30. | Working capital | P |
| 31. | Business operating expenses or current operating expenses | M |
| 32. | Anticipated extraordinary expenses | M |
| 33. | Excess or (shortage) of working capital | P |
| 34. | Investment in unrelated properties | P |
| 35. | Loans receivable unrelated to business | P |
| 36. | AMOUNT ACCUMULATED BEYOND REASONABLE NEEDS OF BUSINESS | P |

COMPUTATION OF ADJUSTED TAXABLE INCOME

| | | |
|---|---|---|
| 37. | Taxable income | P |
| 38. | Net operating loss deduction | P |
| 39. | Capital loss carryback or carryover | P |
| 40. | Dividends received deduction | P |
| 41. | Contribution allowed | P |
| 42. | Contribution actually paid | P |
| 43. | Excess, if any, of 41 over 42 | P |
| 44. | Contribution actually paid | P |
| 45. | Contribution allowed | P |
| 46. | Excess, if any, of 44 over 45 | M |
| 47. | Federal income tax accrued | M |
| 48. | Disallowed net capital loss | M |
| 49. | Net LTCG | P |
| 50. | Net STCL | M |
| 51. | Tax on total taxable income | P |
| 52. | Tax on taxable income excluding excess of LTCG over STCL | M M |
| 53. | Sum of lines 49, 50 and 52 | P |
| 54. | Bank affiliate earnings invested in readily marketable securities | P |
| 55. | ADJUSTED TAXABLE INCOME | P |

COMPUTATION OF DIVIDENDS PAID DEDUCTION

| | | |
|---|---|---|
| 56. | Dividends paid during tax year | M |
| 57. | Dividends paid within 2½ months after the close of the tax year | P |
| 58. | Consent dividends | P |
| 59. | DIVIDENDS PAID DEDUCTION | P |

COMPUTATION OF ACCUMULATED EARNINGS CREDIT

| | | |
|---|---|---|
| 60. | E & P at end of current year | P |
| 61. | E & P at end of prior year | P |
| 62. | Increase in E & P | P |
| 63. | E&P accumulated beyond reasonable needs | P |
| 64. | E & P of current year retained for reasonable needs | P |
| 65. | Net LTCG | P |
| 66. | Net STCL | P |
| 67. | Capital gains tax | P |
| 68. | Tentative accumulated earnings credit (Line 64 minus 65 plus 66 plus 67) | P |
| 69. | Minimum accumulated earnings credit | P |
| 70. | Accumulated E&P at end of preceding tax year | M |
| 71. | Dividends paid during 1st 2½ months of tax year | P |
| 72. | Excess, if any, of 70 over 71 | M |
| 73. | Tentative accumulated earnings credit | P |
| 74. | ACCUMULATED EARNINGS CREDIT(Greater of 68 or 73) | |
| 75. | ACCUMULATED TAXABLE INCOME OR AMOUNT SUBJECT TO TAX UNDER IRC 531 (line 55 minus 59 minus 74) | |

## ATTACHMENT | B-2

**COMPUTATION OF BUSINESS OPERATING CYCLE EXPENSES OR CURRENT OPERATING EXPENSES**

| | | |
|---|---|---|
| 1. | Net adjusted operating expenses for year | |
| 2. | Cost of goods sold | P 2,305,328 |
| 3. | Operating expenses | P 404,580 |
| 4. | Depreciation | M (117,534) |
| 5. | Net adjusted operating expenses for year | P 2,592,374 |
| 6. | Business operating cycle as expressed as a part of a year | |
| 7. | Inventory turnover cycle | |
| 8. | Cost of goods sold | 2,305,328 |
| 9. | Beginning Inventory | 327,400 |
| 10. | Ending Inventory | 411,825 |
| 11. | Line 9 plus line 10 | 739,225 |
| 12. | Average inventory or line 11/2 | 369,613 |
| | OR | |
| 13. | Inventory in month when sum of inventory and receivables is highest | 411,825 |
| 14. | Inventory turnover cycle or line 12 or 13/line 8 | 17.86% |
| 15. | Receivables turnover cycle | |
| 16. | Net sales for year | 3,257,265 |
| 17. | Beginning accounts receivable | 212,097 |
| 18. | Ending accounts receivable | 332,920 |
| 19. | Line 17 plus line 18 | 545,017 |
| 20. | Average accounts receivable or line 19/2 | 272,509 |
| | OR Aug. 1977 | |
| 21. | Accounts receivable in month when sum of inventory and receivables is highest | 521,206 |
| 22. | Receivables turnover cycle or line 20 or 21/16 | 16.00% |
| 23. | Line 14 plus line 22 | 33.86% |
| 24. | Average credit period in days extended by suppliers | 15 |
| 25. | Line 24/365 days | 4.11% |
| 26. | Business operating cycle as expressed as part of a year or line 23 less line 25 | 29.75% |
| 27. | BUSINESS OPERATING CYCLE EXPENSES OR CURRENT OPERATING EXPENSES(Line 5x26) | 771,231 |

**COMPUTATION OF AMOUNT ACCUMULATED BEYOND THE REASONABLE NEEDS OF BUSINESS**

| | | |
|---|---|---|
| 28. | Current assets | P |
| 29. | Current liabilities | M |
| 30. | Working capital | P |
| 31. | Business operating expenses or current operating expenses | P |
| 32. | Anticipated extraordinary expenses | M |
| 33. | Excess or (shortage) of working capital | P |
| 34. | Investment in unrelated properties | P |
| 35. | Loans receivable unrelated to business | P |
| 36. | AMOUNT ACCUMULATED BEYOND REASONABLE NEEDS OF BUSINESS | P |

**COMPUTATION OF ADJUSTED TAXABLE INCOME**

| | | |
|---|---|---|
| 37. | Taxable income | P |
| 38. | Net operating loss deduction | P |
| 39. | Capital loss carryback or carryover | P |
| 40. | Dividends received deduction | P |
| 41. | Contribution allowed | P |
| 42. | Contribution actually paid | P |
| 43. | Excess, if any, of 41 over 42 | P |
| 44. | Contribution actually paid | P |
| 45. | Contribution allowed | P |
| 46. | Excess, if any, of 44 over 45 | M |
| 47. | Federal income tax accrued | M |
| 48. | Disallowed net capital loss | P |
| 49. | Net LTCG | P |
| 50. | Net STCL | M |
| 51. | Tax on total taxable income | P |
| 52. | Tax on taxable income excluding excess of LTCG over STCL | M M |
| 53. | Sum of lines 49, 50 and 52 | P |
| 54. | Bank affiliate earnings invested in readily marketable securities | P |
| 55. | ADJUSTED TAXABLE INCOME | P |

**COMPUTATION OF DIVIDENDS PAID DEDUCTION**

| | | |
|---|---|---|
| 56. | Dividends paid during tax year | P |
| 57. | Dividends paid within 2½ months after the close of the tax year | M |
| 58. | Consent dividends | M |
| 59. | DIVIDENDS PAID DEDUCTION | P |

**COMPUTATION OF ACCUMULATED EARNINGS CREDIT**

| | | |
|---|---|---|
| 60. | E & P at end of current year | P |
| 61. | E & P at end of prior year | M |
| 62. | Increase in E & P | P |
| 63. | E&P accumulated beyond reasonable needs | P |
| 64. | E & P of current year retained for reasonable needs | P |
| 65. | Net LTCG | M |
| 66. | Net STCL | P |
| 67. | Capital gains tax | P |
| 68. | Tentative accumulated earnings credit (Line 64 minus 65 plus 66 plus 67) | P |
| 69. | Minimum accumulated earnings credit | P |
| 70. | Accumulated E&P at end of preceding tax year | M |
| 71. | Dividends paid during 1st 2½ months of tax year | P |
| 72. | Excess, if any, of 70 over 71 | M |
| 73. | Tentative accumulated earnings credit | P |
| 74. | ACCUMULATED EARNINGS CREDIT(Greater of 68 or 73) | P |
| 75. | ACCUMULATED TAXABLE INCOME OR AMOUNT SUBJECT TO TAX UNDER IRC 531 (line 55 minus 59 minus 74) | |

"ATTACHMENT C"

COMPARATIVE CHART - COLUMN 5
ANTICIPATED EXTRAORDINARY EXPENSES

| Factor | FY 76 Plaintiff | FY 76 Defendant | FY 76 Court | FY 77 Plaintiff | FY 77 Defendant | FY 77 Court |
|---|---|---|---|---|---|---|
| Estimated Tax Payments | 172,020 | -- | 172,020 | 331,590 | -- | 331,590 |
| Machinery Replacement | 300,000 | .145,000 | 218,500. | 330,000 | 88,000 | 218,500 |
| Reserve for Losses | 100,000 | 100,000 | -- | 150,000 | 150,000 | -- |
| Self-Ins. for Prod. Liability | 1,200,000 | 300,000 | 1,350,000 | 1,320,000 | 330,000 | 1,630,000 |
| Self-Ins. Casualty | 550,000 | 118,000 | 395,000 | 550,000 | 130,680 | 395,000 |
| Self-Ins. Keyman | 100,000 | 50,000 | 50,000 | 150,000 | 50,000 | 50,000 |
| Stock Redemp. Keyman | 100,000 | None | Not decided | 100,000 | None | Not decided |
| Plant Expansion | 150,000 | None | Not decided | 150,000 | 115,000 | Not decided |
| Market Development | 100,000 | None | Not decided | 100,000 | 10,000 | Not decided |